**STATE of Missouri, Respondent,**

v.

**Archester C. BORDERS, Jr., Appellant.**

**Archester C. BORDERS, Jr., Appellant,**

v.

**STATE of Missouri, Respondent.**

**Nos. WD 44253, WD 45765.**

Missouri Court of Appeals,
Western District.

Oct. 20, 1992.

Motion for Rehearing and/or Transfer to
Supreme Court Denied
Nov. 24, 1992.

Application to Transfer Denied
Jan. 26, 1993.

Byron Neal Fox, Kathleen Kopach Woods, Kansas City, for appellant.

William L. Webster, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before ULRICH, P.J., and SHANGLER and FENNER, JJ.

ULRICH, Presiding Judge.

Archester C. Borders, Jr., was convicted by a jury on September 19, 1990, of two counts of robbery in the first degree (§ 569.020, RSMo 1986), six counts of armed criminal action (§ 571.015, RSMo 1986), and four counts of assault in the second degree (§ 565.060, RSMo 1986). Mr. Borders was sentenced as a prior offender to a total of forty years' imprisonment[1] on December 14, 1990. Mr. Borders subsequently filed a Rule 29.15 motion for postconviction relief, which was denied following an evidentiary hearing. Mr. Borders brings this consolidated appeal contending the convictions and denial of postconviction relief should be reversed. The circuit court's judgment of conviction is affirmed. The motion court's judgment denying the Rule 29.15 postconviction motion is affirmed.

Mr. Borders raises two points on appeal. Mr. Borders contends that the motion court erred in overruling his Rule 29.15 motion because he received ineffective assistance of counsel as a result of (1) his trial counsel's failure to investigate an alibi defense and to call alibi witnesses, and (2) his trial counsel's failure to interview alleged accomplice Dana Wright and subpoena Mr. Wright to appear at trial.

At approximately 12:45 a.m. on May 13, 1989, Julie Atkin Horton and Mark Horton were leaving the Western Container Building at 4323 Clary Boulevard, Kansas City, Missouri, with Mrs. Horton's two young children when two men ran toward them from around the corner of the building. The men yelled "Down on the ground, down on the ground." Mrs. Horton pushed her children into their truck, which was parked in the lot beside the building, and climbed in too, leaving the door open. Mr. Horton slowly lowered himself from the truck to the ground.

One of the men ("first suspect"), whom the Hortons identified at trial as Mr. Borders, was wearing a long coat and carrying a sawed-off shotgun. The other man ("second suspect") had what appeared to the Hortons to be a pistol butt sticking out of the front of his pants, but he never displayed the weapon.

The men told Mr. Horton to throw them his wallet, and in response, Mr. Horton threw his checkbook, because he was not carrying a wallet. The second suspect looked through the checkbook, but could not find any money initially. Frustrated, the man yelled, "We want your wallet. We want your money." Mr. Horton replied, "Look again. That's all I carry. Look again." Still unable to find the money, the second suspect told the first suspect, "Shoot him and I'll search him." Again, Mr. Horton said, "Look again," and this time the man found some twenty-dollar bills in the checkbook.

The second suspect next told the first suspect to get Mrs. Horton's purse. Before either man could get any closer to the truck, Mrs. Horton threw her purse out the open door. The men ordered Mr. Horton to get the purse, so he crawled over, picked it up, and threw it to them.

Once the men had the purse, they began to run across the parking lot. Before the men got to the street, the first suspect turned and fired his shotgun toward the vehicle just as Mr. Horton was about to enter the truck. Pellets struck the front of Mr. Horton's body, Mrs. Horton's hand, and the shoulder of Mrs. Horton's son.

Mr. Horton got into the truck and drove off, looking for a police officer. Three patrol cars returned with the Hortons to the Western Container Building and the police officers searched the area. The officers found most of the Hortons' belongings but could not locate the suspects.

The Hortons gave the police officers their statements and then went home. Subsequently, the police showed the Hortons several photo spreads of possible sus-

---

1. Mr. Borders received two consecutive fifteen-year sentences for robbery in the first degree, one consecutive seven-year sentence for assault in the second degree, and one consecutive three-year sentence for armed criminal action. The court ordered the remaining sentences (two ten-year sentences and three three-year sentences for armed criminal action, and three seven-year sentences for assault in the second degree) to run concurrently.

pects, but the Hortons did not identify anyone. On July 24th or 25th of that year, Mrs. Horton was watching television when she saw a picture of the second suspect on a program called "Kansas City's Most Wanted." She called for Mr. Horton to look at the picture, and he agreed that the person shown on the screen was the second suspect.

The Hortons contacted the police, who determined that the person shown on the television program and identified by the Hortons was Dana L. Wright. The police then showed the Hortons a photo spread that included Mr. Borders' picture, since Mr. Borders was known to be a friend or acquaintance of Mr. Wright. Both Mr. and Mrs. Horton identified Mr. Borders as the first suspect. A few days later, Mr. and Mrs. Horton viewed a lineup and again identified Mr. Borders as the first suspect.

At trial, Mrs. Horton described the first suspect as having lighter skin than the second suspect, but both were "fairly dark." She stated she "saw gold" in the first suspect's mouth. She thought the first suspect was taller than the second, and the second suspect had black hair.

Mr. Horton testified at trial that the first suspect's skin was lighter than the second's and that the first suspect was taller than the second. Mr. Horton did not notice the first suspect having a scar, but did notice he had gold in his mouth. In his deposition, Mr. Horton testified that the first suspect had more than one gold tooth. At trial, Mr. Horton did not know the number of gold teeth the first suspect had. Mr. Horton stated that the first suspect weighed about 160 or 150 pounds and had a medium build, while the second suspect was heavier set and stockier than the first.

At trial, Mr. Borders called three witnesses. Two of those witnesses were Alesha Borders and Stacy Hicks. Alesha Borders, Mr. Border's sister, estimated her brother's height to be about five feet, six inches, and his weight to be about 135 to 140 pounds. She stated he had a scar near his left eyebrow and had one gold cap in his mouth, not two gold teeth. Ms. Borders testified that Dana Wright is lighter-

skinned than her brother and is about six feet tall and slim. She noted Mr. Wright has sandy brown hair. Stacy Hicks testified that he knew Mr. Wright and that Mr. Wright was five foot, eleven inches or six feet tall, slim, with pale yellow skin and light sandy brown hair.

Mr. Border's first trial ended in a hung jury. Following the second jury trial, Mr. Borders was convicted on September 19, 1990, of two counts of robbery in the first degree, six counts of armed criminal action, and four counts of assault in the second degree and sentenced to a total of forty years imprisonment.

In March of 1991, Mr. Borders timely filed a Rule 29.15 postconviction motion seeking to set aside his convictions. Mr. Borders' motion contended that his trial attorney had been ineffective in failing to present an alibi defense in his behalf and in failing to "investigate the whereabouts" of Mr. Borders' alleged accomplice, Mr. Wright.

On November 8, 1991, an evidentiary hearing was held in connection with Mr. Border's Rule 29.15 motion. At that hearing, Mr. Borders' father, Archester C. Borders, Sr., testified that he told his son's trial attorney prior to both trials that his son was at home at the time of the robberies. Mr. Borders, Sr. told his son's attorney that his son was at home when he returned home from work at 11:15 p.m. May 12, 1989, and that they both remained at home until they left at about 4:00 a.m. the following morning on a fishing trip with Mr. Sylvester R. Borders, Mr. Borders, Sr.'s brother, and Preston Windsor, a friend. Mr. Borders, Sr. testified that he walked by his son's bedroom at approximately 1:00 a.m. on May 13, 1989, discovered his son was watching television, and told his son to turn off the television and "go to sleep so he could get up in the morning." Mr. Borders, Sr. stated that his son could not have left the house without his knowledge because the only exit from the house at that time was in the room where he (Mr. Borders, Sr.) was sitting. He told his son's lawyer that he wanted to testify on behalf of his son and that he understood both

Sylvester Borders and Preston Windsor were willing to testify.

Sylvester Borders testified at the Rule 29.15 hearing that he and Mr. Borders, the appellant, went to a bait store at around 9:15 p.m. May 12, 1989, but discovered it was closed and returned to Mr. Borders' house around 10:15 p.m. He left the house at around 10:45 p.m. or 11:00 p.m. and returned at 4:15 a.m. or 4:30 a.m. the next morning to pick up Mr. Borders and Mr. Borders, Sr. for the fishing trip. Sylvester Borders stated that appellant's lawyer never contacted him to discuss the events of May 12 and May 13, 1989, and that if appellant's trial counsel had called him he would have given the same testimony that he gave at the Rule 29.15 hearing.

Mr. Borders, appellant, testified at the Rule 29.15 hearing that he had informed his trial lawyer of his location on the night of the robberies and had asked his lawyer before both trials to contact the alibi witnesses but that his lawyer had failed to do so. Mr. Borders also stated that he asked his lawyer to call Mr. Wright as a witness to prove that Mr. Wright did not match the physical description the Hortons gave of the second suspect. According to Mr. Borders, his lawyer made only one attempt to contact Mr. Wright and was unsuccessful. Although Mr. Borders continually asked his trial counsel to contact Mr. Wright, the lawyer did not try again.

Mr. Borders' trial counsel testified at the hearing that Mr. Borders had told him that he was home asleep at his parents' house at the time the robberies occurred. The lawyer said he investigated Mr. Borders' alibi defense and learned that the only three possible alibi witnesses were Mr. Borders' father, mother, and sister, and that none of them knew from personal knowledge where Mr. Borders was at the time of the robbery. The lawyer stated the alibi witnesses told him Mr. Borders went to bed before his father got home from work and none of them saw Mr. Borders again that evening. As a result of his investigation, Mr. Borders' trial counsel did not believe an alibi defense was viable since it had been his experience that "alibi testimony

from family members is not very good." Instead, the lawyer chose to proceed with a "mistaken identity" defense only, believing this to be the best defense strategy at trial. Mr. Borders' lawyer stated that Mr. Borders and his family agreed that the mistaken identity defense was the better defense and that an alibi defense should not be presented.

Mr. Borders' trial counsel attested that he had tried to contact Mr. Wright but that Mr. Wright had refused to talk with him and "wouldn't have anything to do with [him]." Mr. Borders' did not want to subpoena Mr. Wright as a witness because he had never seen him, never talked with him, and did not know whether he would be in prison clothing or in handcuffs. The attorney presumed Mr. Wright would be a hostile witness and would be identified at trial by the Hortons as the second suspect, Mr. Borders' accomplice. Instead of subpoenaing Mr. Wright, Mr. Borders' attorney chose to use photographs of Mr. Wright showing that he had a light complexion, not a dark skin color as the Hortons had described the second suspect having.

On January 3, 1992, the motion court issued an order, together with findings of fact and conclusions of law, overruling Mr. Borders' Rule 29.15 motion. The motion court found that Mr. Borders' lawyer's decision not to present an alibi defense and not to call Mr. Wright as a witness were reasonable decisions of trial strategy and did not constitute ineffective assistance of counsel.

## I. DIRECT APPEAL

▮ Although Mr. Borders has appealed both his convictions and the denial of his Rule 29.15 motion, Mr. Borders did not brief any issues relating to the direct appeal. As the brief contains no claim of error as to the underlying convictions and judgment, the direct appeal from the judgment of conviction is abandoned and is denied. *See State v. Barnard*, 820 S.W.2d 674, 677 (Mo.App.1991) (appellant raised no claim of error challenging the denial of his Rule 29.15 postconviction motion on his

consolidated appeal and, therefore, abandoned his Rule 29.15 appeal).

## II. POSTCONVICTION PROCEEDINGS

■ Mr. Borders contends as his first point that the trial court erred in overruling his Rule 29.15 motion for postconviction relief because his trial counsel's failure to investigate an alibi defense and failure to call alibi witnesses constituted ineffective assistance of counsel. Mr. Borders maintains that a reasonably competent attorney would have interviewed Mr. Sylvester Borders and Mr. Windsor and would have found that together with Mr. Borders' father, the three would have presented a complete, corroborated alibi defense to bolster the mistaken identity defense.

■ Appellate review of a trial court's denial of a postconviction motion is limited to determining whether the trial court's findings and conclusions are clearly erroneous. Rule 29.15(j); *Leisure v. State*, 828 S.W.2d 872, 873–74 (Mo. banc 1992), *petition for cert. filed*, August 19, 1992. The findings and conclusions are "clearly erroneous" only if, after review of the entire record, the appellate court is left with the definite and firm impression that a mistake has been made. *Leisure*, 828 S.W.2d at 874.

■ In order to prevail on a claim of ineffective assistance of counsel, the movant must show, by a preponderance of the evidence, that his or her attorney (1) failed to exercise the customary skill and diligence that a reasonably competent attorney would perform under similar circumstances, and (2) that the movant was thereby prejudiced. *Id.*, citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984), and *Sanders v. State*, 738 S.W.2d 856, 857 (Mo. banc 1987). A strong presumption exists that the attorney's conduct was proper. *Leisure*, 828 S.W.2d at 874.

■ The selection of witnesses and the introduction of evidence are questions of trial strategy. *Leisure*, 828 S.W.2d at 875. Allegations of ineffective assistance of counsel relating to matters of trial strategy

do not provide a basis for postconviction relief, *Rainwater v. State*, 770 S.W.2d 368, 370 (Mo.App.1989), for counsel is allowed wide latitude in conducting the defense and is entitled to use his or her best judgment in matters of trial strategy. *Stuckey v. State*, 756 S.W.2d 587, 593 (Mo.App.1988). A decision not to call a witness to testify, as a matter of trial strategy, is "virtually unchallengeable." *Leisure*, 828 S.W.2d at 875. In order to demonstrate that defense counsel was ineffective in failing to call a witness to testify, the movant must prove that his or her attorney's failure to call the witness was something other than reasonable trial strategy, that the witness could have been located through reasonable investigation, that the witness would have testified if called, and that the witness's testimony would have provided the accused with a viable defense. *State v. Buchanan*, 836 S.W.2d 90, 94 (Mo.App.1992).

Mr. Borders relies on the decision of the Eighth Circuit in *Lawrence v. Armontrout*, 900 F.2d 127 (8th Cir.1990), for the proposition that he received ineffective assistance of counsel as a result of his trial counsel's failure to interview his alibi witnesses. In *Lawrence*, the appellant, Mr. Lawrence, testified at his postconviction hearing that his main alibi witness was his girlfriend and that there were two other people who could have corroborated his girlfriend's story. *Lawrence*, 900 F.2d at 128–29. Mr. Lawrence's trial counsel interviewed his girlfriend, but when told by the girlfriend that one of the potential corroborating witnesses could not be located and the other would not testify, the attorney made no additional attempts to locate or interview the other witnesses. *Id.* at 129. The Eighth Circuit found that once Mr. Lawrence provided his attorney with the names of potential alibi witnesses, it was unreasonable of the attorney not to make some effort to interview these witnesses in order to ascertain whether their testimony would aid an alibi defense. *Id.* Merely relying on the assertions of Mr. Lawrence's girlfriend that one witness could not be located and the other did not wish to testify fell short of "the diligence that a reasonably competent attorney would exercise un-

der similar circumstances." *Id.* at 129–30. Furthermore, the Eighth Circuit found that Mr. Lawrence's trial attorney's contention that she intended to defend Mr. Lawrence on a theory of misidentification did not excuse her failure to investigate the alibi witnesses. *Id.* at 130. The court believed that the alibi defense would bolster Mr. Lawrence's misidentification defense, rather than detract from it. *Id.*

*Lawrence* is distinguishable under the facts of this case. Unlike *Lawrence,* where the attorney's investigation of potential alibi witnesses consisted only of relying on the assertions of a third person that one witness could not be located and the other would not testify, in this case, Mr. Borders' attorney was told by Mr. Borders himself and his father what Mr. Sylvester Borders and Mr. Windsor would say and how their testimony would corroborate the fishing story. While the *Lawrence* court believed under the facts of that case that an alibi defense would "bolster" a misidentification defense, Mr. Borders' attorney believed, based on his past experience, that presenting an alibi defense which "wasn't credible" in addition to the mistaken identity defense would be more damaging than to proceed without an alibi defense.

Mr. Borders' attorney exercised the customary skill and diligence that a reasonably competent attorney would perform under similar circumstances. The lawyer talked with Mr. Borders' father, mother, and sister—the only three people who could possibly testify Mr. Borders was at home at the time of the robberies—and found that none of them knew from personal knowledge that Mr. Borders was in fact at home at that time. Despite Mr. Borders' father's contention that he told the attorney that his son was home from around 11:15 p.m. the night before the robberies until about 4:00 a.m. the next morning and that he actually found his son in bed watching television fifteen minutes after the robbery occurred and told him to "go to sleep," Mr. Borders' attorney insisted the family told him they only assumed Mr. Borders was asleep in his bedroom the night of the crimes.

Mr. Borders' attorney spoke with Mr. Borders and his father several times before both hearings. They "continually," in the words of Mr. Borders, and "extensively," in the words of the lawyer discussed the possibility of putting on an alibi defense. Mr. Borders and his father stated they told the attorney what Mr. Sylvester Borders and Mr. Windsor would say about the night of the robberies (although the attorney did not recall Preston Windsor's name). The two witnesses would be able to corroborate that Mr. Borders had planned to go fishing before the robberies occurred and did go fishing after the robberies occurred. The two witnesses would not, however, be able to testify from personal knowledge where Mr. Borders was when the robberies occurred.

■ Knowing what the testimony of Mr. Border's father and uncle, and Mr. Windsor would be, Mr. Borders' trial attorney purposefully chose not to present an alibi defense. The attorney stated that his experience taught him that alibi testimony from family members is seldom persuasive, and that a bad alibi defense is often worse than no alibi defense at all. An attorney's deliberate failure to call witnesses whose testimony the attorney fears might actually hurt his or her client's defense is a proper strategic and tactical decision and cannot be a basis for a claim of ineffective assistance of counsel. *See Rodden v. State,* 795 S.W.2d 393, 396 (Mo. banc 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1608, 113 L.Ed.2d 670 (1991). Mr. Borders' trial attorney's decision not to present an alibi defense was reasonable trial strategy under the circumstances.

■ Moreover, Mr. Borders did not establish that he was prejudiced by his counsel's failure to present the alibi defense, the second requirement for proving ineffective assistance of counsel. *Leisure,* 828 S.W.2d at 874. To demonstrate prejudice, a movant must establish a reasonable probability that but for counsel's actions, the outcome of the trial would have been different. *Id.* at 875. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

Neither Mr. Sylvester Borders nor Mr. Windsor had personal knowledge of where Mr. Borders was at the time of the robberies. Whether Mr. Borders' father had such knowledge is questionable. Given the shortcomings in the three witnesses' testimonies, a "probability sufficient to undermine confidence in the outcome" does not exist. The motion court's findings that Mr. Borders' trial counsel was not deficient and that Mr. Borders was not prejudiced in the presentation of his defense are not clearly erroneous. Point one is denied.

Mr. Borders contends as his second point that the motion court erred in denying his Rule 29.15 motion because his counsel's failure to interview Mr. Wright and subpoena him to appear at trial constituted ineffective assistance of counsel.

Mr. Borders maintains that Mr. Wright's presence at the trial would have helped to convince the jury that Mr. Wright could not have been the second suspect in the robberies.

Mr. Borders' trial counsel testified that he had tried to contact Mr. Wright after learning that Mr. Wright was being held in the Wyandotte County Jail, but was unsuccessful, since Mr. Wright "refused to talk to [him]" and "wouldn't have anything to do with [him]." Mr. Borders' attorney did not want to subpoena Mr. Wright as a witness because he had never seen him in person, never talked with him, and did not know whether he would be in prison clothing or in handcuffs. The attorney presumed Mr. Wright would be a hostile witness and would be identified by the Hortons as the second suspect.

If Mr. Borders merely requested Mr. Wright's appearance on the witness stand and not his testimony as Mr. Borders alleged in his brief, at best, Mr. Wright's presence could have helped to establish that Mr. Wright did not match the descriptions given by the Hortons of the second suspect. Mr. Borders' attorney, however, presented that evidence through photographs of Mr. Wright and the testimony of two witnesses. An attorney will not be deemed to have been ineffective for failing to present cumulative evidence. *State v.*

*Twenter,* 818 S.W.2d 628, 636 (Mo. banc 1991). At worst, the fear of Mr. Borders' attorney that the Hortons would identify Mr. Wright as the second suspect could have been realized. If a potential witness's testimony would not unqualifiedly support a defendant, the failure to call that witness does not constitute ineffective assistance of counsel. *Leisure,* 828 S.W.2d at 875.

Mr. Borders failed to establish that the motion court's judgment denying his Rule 29.15 motion was clearly erroneous. Point two is denied.

The judgment of conviction is affirmed. The judgment of the motion court overruling Mr. Borders' Rule 29.15 motion is affirmed.

All concur.