STATE of Missouri, Respondent,

v.

Kevin SCOTT, Appellant.

Kevin SCOTT, Appellant,

v.

STATE of Missouri, Respondent.

Nos. WD 45577, WD 46818.

Missouri Court of Appeals,
Western District.

July 27, 1993.

Raymond L. Legg, Office of the State Public Defender, Columbia, for appellant.

Philip M. Koppe, Atty. Gen., Kansas City, for respondent.

Before BERREY, P.J. and BRECKENRIDGE and HANNA, JJ.

HANNA, Judge.

The defendant, Kevin Scott, was charged and found guilty in the Circuit Court of Boone County, Missouri with Burglary First Degree (§ 569.160, RSMo 1986), Assault First Degree (§ 565.050, RSMo 1986) and Forcible Rape (§ 566.030, RSMo 1986). The defendant was charged and sentenced as a prior and persistent offender pursuant to § 558.016, RSMo Supp.1991. He was sentenced to concurrent sentences of fifteen and thirty years imprisonment for Burglary First Degree and Assault First Degree and a consecutive fifty-year sentence for Forcible Rape. The defendant appeals.

T.B. worked the evening shift at "The Columbia Tribune" in Columbia, Missouri. She left work the morning of February 2, 1991, at approximately 12:30 a.m. and went to Shakespeares Pizza with co-workers where she visited and had one beer. She drove back to "The Tribune" to pick up an item she had forgotten and then to her apartment on Third Avenue in Columbia. She fell asleep and was awakened by a noise in the back part of the apartment. She called out to the person who replied he was there looking for "Mary." T.B. responded by telling the intruder that there was no one by the name of Mary and that he was in the wrong house. She then heard the person enter her other bedroom. When she saw the intruder, she told him he was in the wrong house and tried to give him directions to a house where a person named Mary might live. When he was told to leave, the defendant asked, "Do you live here alone?" T.B. answered, "I live here alone with my daughter."[1]

T.B. turned her back and the defendant struck her in the back of the head with a cider jug. As she turned to face the defendant, he struck her again with the jug across the face, breaking her nose. The defendant pushed her into the living room and said, "Get down on the floor, I'm going to rape you," which he did. She complained, "You're hurting me," and began to cry. At this point, the defendant got up and acted as if he was going to leave. He asked, "Did you see my face? Do you know what I look like?" Because she was afraid that he would kill her, T.B. answered that she had not seen his face. He struck her again on the back of the head causing her to fall forward. She slumped forward, feigning unconsciousness and heard the defendant walk in the direction of the kitchen. She heard what sounded like the defendant rummaging through a box she kept in her kitchen containing large kitchen implements, including her knives. She believed "that he was getting a knife to kill [her] because [she] had seen him." T.B. struggled to her feet, ran out the door to her neighbors house where she broke a window to gain entry and found the telephone. She dialed 9–1–1.

T.B. was taken to the emergency room of the Boone Hospital Center in Columbia shortly after the attack. The emergency room physician noted a number of large lacerations, contusions, and abrasions,

---

1. The daughter was staying with friends that night.

mostly to her face, and some on her shoulders and back. A pelvic examination revealed some external irritation in the genital area. The physician expressed his opinion following his examination that T.B.s condition was consistent with a sexual assault.

Later that morning, another doctor closed a severe laceration across T.B.s nasal ridge and set her broken nose bone. The physician described the injuries as a "protracted loss of some of th[e] function" of her nose.

When T.B. returned home the next morning after being released from the hospital, she entered her kitchen and noticed a large butcher knife that she seldom used, laying on the table. She later realized she had not used that knife in a long time.

The defendant was arrested two weeks later in Woodson Terrace, Missouri, a suburb of St. Louis. Other than a two-weeks growth of facial hair, the defendant matched the description of the attacker that T.B. had given to the police. T.B.s wallet was found in the backyard where the defendant was then living.

During the drive from St. Louis to Columbia, the defendant was advised of his *Miranda*[2] rights and was questioned by the officers of the Columbia Police Department. He denied any involvement in the crimes, but later told the officers that when he had been in Columbia, he smoked crack cocaine every day. He said he "ganked" people. The term "gank" meant taking money from an individual who wished to buy cocaine, but not delivering the cocaine. He later told the police officers he ganked some women who claimed he had raped them to get even.

One police officer suggested they drive through the area and perhaps the defendant might recognize the residence of one of the women he had ganked and who might now be claiming he had raped her. They drove past T.B.s apartment where two people were standing out front. The defendant looked at them. Later that evening, the police officer asked him, "Did you mean to hurt the girl?" to which the defendant responded, "No, man, I didn't mean to hurt her. And I didn't rape her either." He then admitted that when T.B. came out of her bedroom, he rushed her, pushed her down and took her wallet. He admitted she might have hit her head when she fell.

When the officer asked the defendant where the burglary occurred, the defendant explained that the burglary occurred to a house real close to "where those dudes were standing out front." The officer explained that the house where there were two people standing in front was the victims. Later, the defendant admitted breaking into T.B.s place to steal money to buy drugs and that he was surprised by a woman who he pushed down. He continued to deny that he raped her.

He told the police officers that on the night of the burglary he was wearing a brown jacket, a pair of white top Pony tennis shoes and faded blue jeans. T.B. had earlier told the police that the intruder was a light-skinned black, between 5′6″ and 5′8″ in height, weighing 160–170 pounds, clean-shave, clean-cut, and young looking, perhaps in his early 20s and wearing a short jacket of some kind, maybe jeans, and sneakers. She also told the police that her wallet and car keys, which had been in her purse in the bedroom, were stolen.

### Rule 29.15 Proceeding

The defendant filed a pro se motion under Rule 29.15 claiming his trial counsel failed to interview or call alibi witnesses. At the evidentiary hearing, the defendant testified that he asked his attorneys to call several of his friends to testify as alibi witnesses. The defendants claim of ineffective assistance of counsel centers on one Ray Cheatum, whom the defendant claims would provide him an alibi defense.

Trial counsel, Ms. Kay Evans, and her investigator, Rollin Thompson, interviewed Cheatum. As a result of the initial interview, Ms. Evans concluded that she would call him as an alibi witness for the defense. However, during two subsequent interviews with Mr. Thompson, Cheatum was

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

unable to pinpoint the dates and times he had been with the defendant. Cheatum told investigator Thompson that he and the defendant would frequently spend an entire weekend smoking crack cocaine but that he could not identify any particular weekend when this occurred. Moreover, he indicated that sometimes during the weekend, the defendant would leave, but he couldn't recall one weekend or the other. Ultimately, trial counsel decided not to use Cheatum as an alibi witness because his testimony would not be sufficient to provide an alibi defense.

During investigator Thompsons second interview, Cheatum told Thompson that his attorney, Andrew Hernandez, "had told him there's a chance he could get a year or two out of it and leave it alone." Mr. Hernandez was the public defender in Boone County and the supervisor of trial counsel, Kay Evans.

Following the Rule 29.15 motion, the motion court entered its order denying relief to defendant and specifically, rejected the defendants claim that his trial attorney was ineffective in failing to call Cheatum as an alibi witness. The motion court found the credible evidence to be that Cheatum could not provide an alibi when interviewed prior to trial and denied the Rule 29.15 motion. The defendant appeals this order, as well as the underlying conviction. The appeals have been consolidated.

The defendant raises two points of error from the underlying criminal trial, in both instances requesting plain error review. The first point deals with the admission into evidence of the butcher knife and the second, with the submission of instruction MAI–CR3d 302.04 defining reasonable doubt. The Rule 29.15 appeal raises two issues regarding the effectiveness of trial counsel.

■ A large butcher knife, seldom used by T.B., was found laying on her kitchen table the morning after the crimes were committed. The defendant acknowledges that the knife was neither objected to nor was the issue raised in his motion for new trial. The defendant requests plain error review pursuant to Rule 29.12(b). The

standard for plain error review is whether the error resulted in manifest injustice or a miscarriage of justice. Rule 29.12(b); *State v. Johnson*, 829 S.W.2d 630, 633 (Mo. App.1992).

■ Weapons are admissible in evidence even though they are not directly connected to defendant, or even if they were not used in the crime, *State v. Lockheart*, 757 S.W.2d 221, 223 (Mo.App.1988), so long as they "bear on the crime with which he is charged." *State v. Friend*, 822 S.W.2d 938, 944 (Mo.App.1991).

The victim testified that the defendant walked to the kitchen and that it sounded as though the defendant was going through a box where she kept several knives. She described the sound as distinctive. The defendants actions caused her to believe that he was getting a knife to kill her because she had seen his face and could identify him. Accordingly, she struggled to her feet, ran to the neighbors house and called the police. During a police officers testimony, the state formally requested that the knife be admitted into evidence. The defendant's trial attorney, stated, "No objection."

■ The defendant's response of "no objection" to the offer of the knife is an affirmative waiver of any objection at trial, and the matter will not be considered under the plain error doctrine. Rule 30.20; *State v. Ealey*, 727 S.W.2d 165, 167 (Mo.App. 1987). As opposed to a simple failure to object, which may warrant plain error review, a statement by defendant's counsel that there is no objection to the mention of a particular piece of evidence precludes a finding that the failure to object was negligent or inadvertent and renders that evidence admissible. Further evidence of the deliberate waiver (and relegating the admission of the butcher knife to a harmless error, if any error) is the fact that the defendant made no objection to the testimony of either T.B. or the police officer at the time they testified concerning the presence and discovery of the knife. Point denied.

■ The defendant claims that the trial court committed "plain error" in submit-

ting jury instruction MAI–CR3d 302.04, which defines proof beyond a reasonable doubt as proof that leaves one "firmly convinced" of the defendant's guilt. It is the defendant's argument that the definition dilutes the state's burden of proof.

We decline to review this issue under the plain error doctrine. There is judicial reluctance to invoke plain error review and Missouri courts have used the rule only sparingly on a case-by-case basis. *See State v. Daly*, 798 S.W.2d 725, 729 (Mo. App.1990); *State v. Koonce*, 731 S.W.2d 431, 442 (Mo.App.1987); *State v. Smith*, 726 S.W.2d 418, 421 (Mo.App.1987). This reluctance is particularly true since our Supreme Court has repeatedly ruled that giving the "reasonable doubt" instruction in present form does not constitute an error. *State v. Griffin*, 848 S.W.2d 464, 469 (Mo. banc 1993); *State v. Ervin*, 835 S.W.2d 905, 924 (Mo. banc 1992), *cert. denied,* — U.S. —, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993).[3] The only purpose for raising this issue on appeal, as stated in the defendants brief, is to preserve the matter "in the event some court in the future concludes the reasonable doubt definition is constitutionally deficient." This argument is not a sufficient basis for plain error review.

Trial counsel has waived the point by failure to register an appropriate objection with the trial court at the instruction conference or in the motion for new trial. The point has been waived and, therefore, the request that we review it is denied.

■ Next, in his Rule 29.15 motion, defendant claims he was denied his right to *effective assistance of counsel* because (1) his trial counsel failed to call as a witness, one Ray Cheatum, who the defendant maintains would have supported his alibi defense; and (2) there was a conflict of interest between trial counsel, Kay Evans, and Mr. Cheatum's attorney, Andrew Hernandez, who was Ms. Evans' supervisor in the Boone County Public Defenders Office.

Our standard of review of the denial of a post-conviction motion is limited to a determination of whether the findings of fact and conclusions of law issued by the hearing court are "clearly erroneous." Rule 29.15(j); *Leisure v. State*, 828 S.W.2d 872, 874 (Mo. banc 1992), *cert. denied,* — U.S. —, 113 S.Ct. 343, 121 L.Ed.2d 259 (1992). Deference will be given to the hearing court's superior opportunity to judge the credibility of the witnesses. *State v. Twenter*, 818 S.W.2d 628, 635 (Mo. banc 1991). Not only must the movant prove his case by a preponderance of the evidence, but a heavier burden arises from the "strong presumption" that counsel performed in a reasonable manner. *Sanders v. State*, 738 S.W.2d 856, 858 (Mo. banc 1987).

In addressing the failure to call Mr. Cheatum as a witness, we find such a decision within the purview of trial counsel's discretion. There was a serious question that the testimony was of any value at all. During two of the interviews, Mr. Cheatum told the investigator that he could not remember the exact weekends or times that the defendant was with him and that occasionally, when they were together, the defendant would leave for periods of time. Additionally, counsel had to balance the benefits of the testimony against the fact that the defendant and witness Cheatum spent their weekends together smoking crack cocaine. Trial counsel would be aware that a fact finder would question the evidence of an individual who is testifying about matters that arise while under the influence of crack cocaine. It is to be expected that a trial attorney would closely scrutinize such testimony before presenting it to a jury. These, of course, are tactical decisions that counsel would consider in balancing the effect of the testimony, and as such fall within the realm of reasonable trial strategy. *See State v. Borders*, 844 S.W.2d 49, 54 (Mo.App.1992); *State v. Buchanan*, 836 S.W.2d 90, 93 (Mo.App.

---

3. On at least three occasions, the United States Supreme Court has denied certiorari of this issue. *See State v. Ervin*, 835 S.W.2d 905 (Mo. banc 1992), *cert. denied,* — U.S. —, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993); *State v. Murray*,

744 S.W.2d 762, 771 (Mo. banc 1988), *cert. denied,* 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988); *State v. Guinan*, 732 S.W.2d 174, 178 (Mo. banc 1987), *cert. denied*, 484 U.S. 933, 108 S.Ct. 308, 98 L.Ed.2d 266 (1987).

1992). The hearing courts findings were not "clearly erroneous." Point denied.

■ It is claimed that there was a conflict of interest developed by investigator Thompson's testimony that trial counsel's supervisor allegedly advised Cheatum, a potential defense witness, that "there's a chance he could get a year or two out of it and leave it alone." The exact meaning of this statement is unclear as the speaker may have, as defendant contends, meant that the witness should avoid going to court because he could make an admission that could result in his incarceration. On the other hand, it may have been that the attorney was advising his client of the unlawful aspects of perjured testimony; in which event there would be no conflict of interest. The meaning of the statement was not explained as Mr. Hernandez was not called to testify as to the meaning of the statement. Additionally, Ms. Evans testified that the decision not to call Cheatum as a witness was based, not upon this statement, but rather upon the fact that Cheatum could not provide defendant with an alibi on the date of the crimes.

It is this statement alone that creates the alleged conflict of interest between two public defenders and the representation of their respective clients. With nothing more than an ambiguous statement we can find no prejudice to the defendant. Conjecture or speculation is not sufficient to establish that the statement represents a conflict of interest resulting in a violation of the standard for ineffective assistance of counsel. *Buchanan*, 836 S.W.2d at 93. The burden of proof was on the movant and there is a strong presumption that counsel performed in a reasonable manner. *Sanders*, 738 S.W.2d at 858. Again, the ruling of the hearing court was not "clearly erroneous." Point denied.

The judgment of the convictions and denial of the Rule 29.15 motion are affirmed.

All concur.