STATE of Missouri, Plaintiff–
Respondent,

v.

Oscar F. CHONG–AGUIRRE,
Defendant–Appellant.

No. SD 32108.

Missouri Court of Appeals,
Southern District,
Division Two.

Nov. 12, 2013.

Margaret Mueller Johnston, Columbia, MO, attorney for appellant.

Richard A. Starnes, Jefferson City, MO, attorney for respondent.

DON E. BURRELL, J.

Oscar F. Chong–Aguirre ("Defendant") was convicted after a jury trial of first-degree drug trafficking. *See* section 195.222.[1] Defendant contends the trial court committed reversible error by: (1) overruling his motion to suppress and admitting into evidence drugs seized during a search of his truck after a "second stop" because the officers did not have a reasonable suspicion "based upon specific articulable facts" that criminal activity was afoot; and (2) overruling his motion for judgment of acquittal because the State failed to produce sufficient evidence that he "intentionally possessed the cocaine found hidden among the boxes of lettuce in the [truck's] trailer, or that he had an awareness of the drug's presence and nature[.]"

Because Defendant agreed at trial to the admission of the evidence he now claims

---

1. Unless otherwise indicated, all statutory references are to RSMo Cum.Supp.2009. All rule references are to Missouri Court Rules (2013).

should have been excluded, and there was sufficient evidence from which a reasonable juror could infer that Defendant was in possession and control of the drugs seized, we affirm.

### Factual and Procedural Background [2]

Viewed in the light most favorable to the verdict, the evidence was as follows. On January 30, 2009, Defendant was traveling with Eddie Dorantes in a commercial truck owned by Defendant. Defendant and Mr. Dorantes were working as co-drivers.[3] Linda Stafford, an officer with the Missouri State Highway Patrol, stopped the truck for an inspection when it passed through a weigh station near Joplin. Officer Stafford was not familiar with the company name listed on the truck, so she asked Mr. Dorantes, who was driving at the time, to show her the paperwork and permits associated with the truck. Inside the weigh station, Mr. Dorantes showed Officer Stafford his commercial driving license, log books, the truck's registration, fuel permits, and other paperwork related to the truck's cargo. Shortly thereafter, Defendant also entered the weigh station and presented his commercial driver's license. Officer Stafford requested that Defendant return to the truck so that he would not be required to come on duty and record a break in his time in the sleeper berth.

Officer Stafford noticed "inconsistencies" in the paperwork presented to her. A bill of lading indicated that Mr. Dorantes had picked up his shipment of lettuce in Arizona at 12:33 a.m. and "loaded out" at 1:22 a.m. on January 28th. His log book, however, indicated that he did not arrive to pick up the shipment until 2:00 a.m. A second bill of lading indicated that Mr. Dorantes picked up more cargo at 11:13 that morning in Yuma, Arizona and was ready to load out at 3:33 p.m. His log book was inconsistent with the bill of lading because the log book indicated that he was in the midst of a 12–hour off-duty period at the time.

Mr. Dorantes's log book listed the location of the 12–hour off-duty period as "Fontana." Because Mr. Dorantes's driver's license indicated that he lived in Las Vegas, Officer Stafford asked him how he got from Las Vegas to Fontana without driving. Mr. Dorantes said that his wife drove him. Officer Stafford knew that would have entailed an 8–hour round trip by Mr. Dorantes's wife to pick him up in Fontana and return him to his home in Las Vegas, followed by another 8–hour round trip for her to take him back to Fontana. While these actions would not have been illegal, they didn't "make sense" to Officer Stafford because they were not "cost efficient"—something an officer in her line of work looks for.

When she asked Mr. Dorantes to explain this oddity to her, he then changed his explanation and told her that after he loaded out from Yuma, he drove the truck west to Fontana. Mr. Dorantes's log book also showed his status as "off duty" for over fifteen hours during and after the time the truck was loaded with lettuce—a perishable product that begins to wilt as soon as it is harvested. The perishable nature of the lettuce meant that Defendant and Mr. Do-

**2.** When addressing the suppression issue, we include evidence adduced both at the motion hearing and at trial. *State v. Neel*, 81 S.W.3d 86, 94 (Mo.App.W.D.2002).

**3.** Co-drivers are very common in the trucking industry, especially for cross-country drivers.

Because commercial drivers can only drive for a limited number of hours before they are required to rest, a co-driver drives while the other co-driver takes mandatory rest in the sleeper berth.

rantes had a limited number of days in which to deliver that product to the customer.[4]

The logs also indicated that after Mr. Dorantes picked up his cargo in Arizona—which was to be delivered east to New York—he went west through California. This seemed suspicious to Officer Stafford because that route added "at least eight hours of unnecessary driving" to the trip. When she questioned Mr. Dorantes about the route, he explained that in order to get onto I-10 to get to his destination, he had to go back through California. Officer Stafford ran the route through a computer program which showed that Mr. Dorantes had not taken the most direct, cost efficient route after picking up the lettuce. When she showed the program's results to Mr. Dorantes, he "became a little bit disturbed[,]" and she "got the impression he was trying to smooth talk" her. He then changed his explanation yet again and said he went back west to pick up Defendant in California. Based on these unusual circumstances and inconsistencies, Officer Stafford suspected that the records in Mr. Dorantes's log book had been falsified.

While she was reviewing the log books, Officer Stafford suddenly became ill. She handed the paperwork back to Mr. Dorantes and told him "I've got something more pressing. You better get on out of here before I change my mind." Mr. Dorantes then "hot footed it out to the truck[.]" On her way to the restroom, Officer Stafford informed other officers that she "felt like that truck needed to be looked at closer . . . that there was a load of dope going down the road that [she had] just let go."

Officer Ted Wilkins went outside and stopped the truck when it was thirty to forty feet from the weigh station. When he approached the cab of the truck, both Mr. Dorantes and Defendant were "visibly laughing." Officer Wilkins re-examined their paperwork and noticed the same inconsistencies that had aroused Officer Stafford's suspicions. Two DEA agents, who were working on the other side of the interstate, were summoned to examine the paperwork. Officer Wilkins also reviewed Defendant's log book, which indicated that he had joined Mr. Dorantes in the truck after the cargo had been picked up in Arizona.

Defendant gave the DEA officers permission to search the truck and trailer. The trailer door was secured with a padlock. The officers located two keys to the lock, one on a key ring in the ignition and another in a cup holder in the cab's dashboard. Once inside the trailer, the two officers observed pallets and boxes of produce stacked inside. The boxes were "very tightly compressed" in the trailer, but there was an open space of approximately two feet between the top of the boxes and the top of the trailer. The officers crawled on top of the boxes, checking with their flashlights for anything abnormal in the load. There were two different kinds of lettuce in the load, and they were separated by type. One of the officers discovered a black, duct-taped object when he shined his flashlight into the space between the two types of lettuce. There he found numerous "black kilo-size package[s]" concealed in a produce box. When he cut into one of the packages, he found a white powder that he recognized as cocaine.

The officers then transported the truck to another location where they unloaded the cargo and discovered a total of 226

---

4. Officers are commonly tipped off by down time on the log books, produce loads, and multiple bills of lading for the same product, all of which were present in Defendant's case.

packages of cocaine.[5] Sean Henry, a special agent with the DEA, estimated that the cocaine seized had a street value of more than 20 million dollars. He testified that, in his experience, a shipment of that size would be sent with a trusted member of a drug organization, not with a first-time courier. Agent Henry identified two documents retrieved from the cab of the truck (Exhibits 7 and 8) as ledgers used by drug traffickers to keep track of how much they have earned or are owed. Those exhibits contained the following information:

[Exhibit 7]

| | | | |
|---|---|---|---|
| TRIP ONE REMAINING BALANCE | | $ 12,000 | |
| TRIP TWO REMAINING BALANCE | | $ 6,800 | |
| TRIP THREE | 167 PSC | $167,000 | |
| TRIP FOUR | 45 PSC | $ 54,000 | |
| | | | |
| TOTAL DUE | | $239,800 | |
| TOTAL DUE AFTER COMM /TOTAL COMM. ADV | | | $158,850 |
| | | | |
| TOTAL DUE TRIP ONE 25% COMM | | $ 7,000.00 | SOBRINO |
| TOTAL DUE TRIP TWO 25% COMM | | $41,750 | SOBRINO |
| OTHER COMM. TRIP ONE | | $ 950 | COOKIE· |
| OTHER COMM TRIP TWO | | $ 1,250.00 | COOKIE |
| | | | |
| TOTAL COMM DUE | | | $ 79,425 |

| | |
|---|---|
| TOTAL COMM. PAID | |
| TOTAL COMM. RECEIVED | |
| TOTAL DUE BEFORE COMM. | $239,800 |
| TOTAL DUE AFTER COMM. | $188,850 |
| TOTAL DUE AFTER ADV. | $158,850 |
| | |
| TOTAL DUE EACH | $ 79,425 |

| | |
|---|---|
| ADV | $ 47,620 |
| ADV | $ 7,000.00 |
| ADV | $ 5,000.00 |

| [Exhibit 8] | | |
|---|---|---|
| OSCAR | $79,425 | |
| | ADV | $26,805.00 |
| | ADV | |
| | | |
| EDDIE | $79,425 | |
| | ADV | $ 7,000.00 |
| | ADV | $ 5,000.00 |
| | ADV | $47,620.00 |
| | | |
| | | 19,805.00 |

Agent Henry testified that, in his experience, "PSC" stood for pieces, meaning kilograms of cocaine, and that the monetary figure represented the amount owed to the driver for transporting the cocaine. He explained that, based upon his review of Exhibit 7, the driver would receive $1,000 per piece for trip three and approximately the same amount per piece for trip four. This rate coincided with the standard fee for transporting cocaine, which, in Agent Henry's experience, was $1,000 to $1,500 per piece. Although Agent Henry was

---

**5.** A lab report confirmed that the shipment contained a total of 260.02 kilograms of cocaine. According to the prosecutor, 260 kilograms is roughly 573 pounds.

unable to identify either "Sobrino" or "Cookie," the amounts owed to each, based upon the figures in Exhibit 7, matched the amounts owed to Defendant and Mr. Dorantes, respectively, based upon the first names "Oscar" and "Eddie" referenced in Exhibit 8. Agent Henry reiterated that the commission owed Defendant, as reflected in Exhibit 8, was more than the commission typically earned for brokering produce.

Agent Henry had briefly interviewed Defendant after Defendant waived his *Miranda*[6] rights. Defendant told Agent Henry that he owned the truck and was en route to New York to deliver the produce in the trailer. He told Agent Henry that he was to receive $5,000 for the delivery, which he planned to split with Mr. Dorantes.

## Analysis

### Point I

■ Defendant argues in support of his first point that the trial court clearly erred "in finding that Officer Wilkins had reasonable suspicion to stop [Defendant] a second time after he was released by Officer Stafford, in overruling [Defendant]'s motion to suppress the evidence seized as a result of that second stop, and in admitting the evidence of the unlawfully-seized evidence at trial[.]" Because Defendant agreed at trial to the admission of the evidence he now argues should have been excluded, we do not need to determine

whether the evidence would have been admissible if the issue had been properly preserved for our review.[7]

■ The trial court held a hearing on Defendant's motion to suppress on November 6, 2009. At the conclusion of the hearing, it overruled the motion, finding that there was reasonable suspicion to conduct the search. "The filing of a motion to suppress is insufficient to preserve an issue for appellate review; instead, a defendant must object when the challenged evidence is offered at trial[.]" *State v. O'Neal*, 392 S.W.3d 556, 561–62 (Mo.App. W.D.2013). "The trial court must be given the opportunity to reconsider its prior ruling against the backdrop of the evidence adduced at trial." *State v. Lloyd*, 205 S.W.3d 893, 900 (Mo.App.S.D.2006) (quoting *State v. Morrow*, 996 S.W.2d 679, 681–82 (Mo.App.W.D.1999), *abrogated on other grounds by State v. Withrow*, 8 S.W.3d 75, 79 n. 3 (Mo. banc 1999)).

■ "As opposed to a simple failure to object, which may warrant plain error review, a statement by defendant's counsel that there is no objection to … a particular piece of evidence precludes a finding that the failure to object was negligent or inadvertent and renders that evidence admissible." *State v. Stevens*, 949 S.W.2d 257, 258 (Mo.App.S.D.1997) (quoting *State v. Scott*, 858 S.W.2d 282, 285 (Mo.App. W.D.1993)). Here, as revealed by the following colloquy from the trial transcript, defense counsel went beyond simply say-

---

**6.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**7.** Appellate courts have sometimes reviewed a suppression issue on its merits where the parties and the trial court all "understood"-despite an affirmative "no objection" voiced at trial-that the defendant nonetheless intended to preserve a carefully litigated issue for appellate review. *See State v. Oglesby*, 103 S.W.3d 890, 891 (Mo.App.E.D.2003), and

*State v. Baker*, 103 S.W.3d 711, 716–17 (Mo. banc 2003). For an analysis of the means by which such a "mutual understanding" might be demonstrated, see *State v. Williams*, No. SD32270, 2013 WL 4519928 (Mo.App. Aug. 27, 2013). Here, as set out *infra*, the transcript reveals that the trial court's understanding was that Defendant was agreeing to the admission of the evidence now being challenged on appeal.

ing "no objection"; he affirmatively agreed to the admission of one of the "bricks" of the seized cocaine and one or two photographs of it.

THE COURT: Anything before recess?

[the prosecutor]: I don't believe so, Judge, other than—

THE COURT: Are these motions we previously talked about?

[the prosecutor]: I believe so.

THE COURT: What is the motion in limine?

[defense counsel]: Your Honor, the motion in limine dealt with [the prosecutor]'s request that she was going to bring in a quantity of contraband, and I wanted to limit it. We have received by discovery photographs, and they are color photographs, but—may I approach, your Honor? There are half a dozen of these that show a quantity of contraband, and it is significant. I think it's 226 kilos, actually. And I was going to ask the Court to limit it to one or two. Really, I think all we need is one. And the amount speaks for itself. I don't think we need to wheel it all in here or carry it all in. I[sic] they'll have a chance to see the pictures. And as I say, there are probably half a dozen that show that whole quantity. And then you take one of the actual bricks itself and I think it—

THE COURT: So have you reached an agreement?

[the prosecutor]: No, Judge, we haven't.

THE COURT: What are you planning on bringing?

[the prosecutor]: Two things, Judge. We have some additional photos. I believe these would be for demonstrative purposes. This was sent to counsel via e-mail.

[defense counsel]: That's correct.

[the prosecutor]: We do have another picture. Judge, as we spoke earlier, we completely understand the significant difficulties in bringing that much contraband into the courtroom. What we have done, your Honor, is upstairs we have a Highway Patrol officer who was present that night. We have one box, which is—they are boxed up in the evidence locker in Springfield in the Highway Patrol office, Judge. He brought with him one box, which contains seven pieces or kilograms. It's the state's intention to offer that evidence.

THE COURT: How many bricks do you have?

[the prosecutor]: Upstairs, Judge, we just have seven.

THE COURT: *Do you [addressing defense counsel] object to that?*

[defense counsel]: *No.* I just don't even see the purpose for all seven, but I will certainly submit it to you. *I think one of them speaks for itself.*

THE COURT: *If you have no objection, I'll admit it.* I mean, if I was the prosecutor, I would be attempted [sic] to bring them all in, but she's agreed to seven. *So you've agreed, so I don't have to rule on it.*

[defense counsel]: *That's fine, your Honor.*

THE COURT: I didn't know you had them. I was counting them up by rows. It seemed like there were at least 150 there. So you [referring to the prosecutor] are only bringing in seven out of 220?

[the prosecutor]: 226.

THE COURT: *So that's about three percent, so I don't see any prejudice in that.*

[defense counsel]: *No, I can deal with that.*

(Emphasis added).

Later in this same discussion, the prosecutor offered to lay a foundation for the admission of the photograph. Defense counsel responded, "You don't need to. I'm not contesting that that night they conducted a search. We've already had the issue about the search." Defendant argues that the prosecutor's response— "Yeah, we're down to the one element"— indicates there was a "mutual understanding" that Defendant was maintaining his objection to the admission of the evidence seized in the search. We reject the argument as it ignores defense counsel's earlier agreement, and it attempts to draw an unreasonable inference from the prosecutor's response here.

Defendant affirmatively agreed to the admission of the evidence he now argues should have been excluded. Point I is denied.

## Point II

Defendant's second point claims the trial court erred in overruling his motion for judgment of acquittal because the evidence was insufficient to prove beyond a reasonable doubt that he "consciously and intentionally possessed the cocaine found hidden among the boxes of lettuce in the trailer, or that he had an awareness of the drug's presence and nature[.]" We disagree.

Defendant was convicted of first-degree trafficking.

A person commits the crime of trafficking drugs in the first degree if ... he distributes, delivers, manufactures, produces or attempts to distribute, deliv-

er, manufacture or produce more than one hundred fifty grams of a mixture or substance containing a detectable amount of coca leaves, except coca leaves and extracts of coca leaves from which cocaine, ecgonine, and derivatives of ecgonine or their salts have been removed; cocaine salts and their optical and geometric isomers, and salts of isomers; ecgonine, its derivatives, their salts, isomers, and salts of isomers; or any compound, mixture, or preparation which contains any quantity or any of the foregoing substances.

Section 195.222.2. "If the quantity involved is four hundred fifty grams or more[,[8]] the person shall be sentenced to the authorized term of imprisonment for a class A felony which term shall be served without probation or parole." Section 195.222.2(2).

■■■ "Although possession ... is not an element of the crime of first-degree trafficking, evidence of knowing possession may support the conviction when the state alleges that the defendant attempted to distribute, deliver, manufacture or produce the controlled substance, and this evidence may be circumstantial." *State v. Stover*, 388 S.W.3d 138, 146 (Mo. banc 2012). In regard to possessing a substance,

[a] person, with the knowledge of the presence and nature of a substance, has actual or constructive possession of the substance. A person has actual possession if he has the substance on his person or within easy reach and convenient control. A person who, although not in actual possession, has the power and intention at a given time to exercise dominion or control over the substance either directly or through another per-

---

**8.** Here, the parties stipulated that the amount of cocaine seized from Defendant's truck was more than 450 grams.

son or persons is in constructive possession of it. Possession may also be sole or joint.

Section 195.010(34). "Absent proof of actual possession, constructive possession may be shown when other facts buttress an inference of defendant's knowledge of the presence of the controlled substance." *State v. Purlee*, 839 S.W.2d 584, 588 (Mo. banc 1992).

 "In cases involving joint control of an automobile, 'a defendant is deemed to have both knowledge and control of items discovered within the automobile, and, therefore, possession in the legal sense, where there is additional evidence connecting him with the items.' " *State v. Woods*, 284 S.W.3d 630, 639–40 (Mo.App. W.D.2009) (quoting *State v. Sanderson*, 169 S.W.3d 158, 164–65 (Mo.App.S.D. 2005)). "This additional evidence must demonstrate sufficient incriminating circumstances to permit the inference of a defendant's knowledge and control over the controlled substance." *Sanderson*, 169 S.W.3d at 165. "Whether evidence is sufficient to connect a defendant to a controlled substance will be determined by considering the totality of the circumstances." *State v. Richardson*, 296 S.W.3d 21, 24 (Mo.App.S.D.2009).

> When reviewing the sufficiency of evidence supporting a criminal conviction, the Court gives great deference to the trier of fact. *State v. Chaney*, 967 S.W.2d 47, 52 (Mo. banc 1998). Appellate review "is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *Id.* In applying

this standard, "the Court accepts as true all of the evidence favorable to the state, including all favorable inferences drawn from the evidence and disregards all evidence and inferences to the contrary." *Id.*

*State v. Oliver*, 293 S.W.3d 437, 444 (Mo. banc 2009).

 Here, the State was required to present additional incriminating evidence because Mr. Dorantes and Defendant exercised joint control over the truck. He and Mr. Dorantes worked as co-drivers, and they both had access to the contents of the trailer by means of the padlock keys in the cab of the truck. The truck was owned by Defendant, which creates a "clear implication" that Defendant, rather than Mr. Dorantes, controlled the cocaine. *See State v. McNaughton*, 924 S.W.2d 517, 526 (Mo. App.W.D.1996) (holding that one of the facts supporting a reasonable inference that the defendant had possession of marijuana found in a car occupied by two people was that the defendant was the owner of the vehicle), *overruled on other grounds by State v. Pond*, 131 S.W.3d 792, 794 (Mo. banc 2004).

 Additionally, in the trucking industry, custody, command, and responsibility for the load is with the owner-operator, here, Defendant. Officers seized a large quantity of drugs having an extremely high monetary value from Defendant's truck. *See Woods*, 284 S.W.3d at 640. Mr. Dorantes changed his story twice when explaining to Officer Stafford why he traveled to California instead of taking the most direct route to New York after picking up his perishable cargo in Arizona.[9]

---

9. Defendant's argument incorrectly assumes that the jury was required to believe Mr. Dorantes's statements that Defendant did not accompany him to Arizona and was not present when the cargo was loaded onto the trail-

er. This court does not act as a "super juror" and, as earlier noted, we must give great deference to the trier of fact. *State v. Nash*, 339 S.W.3d 500, 509 (Mo. banc 2011). The jury is free to believe all, some, or none of a

Mr. Dorantes also falsified his logs, which Defendant, as his co-driver, would presumably be aware of because each of their logs would have to "basically mirror" the other's. Consciousness of guilt can be inferred from false statements made in an attempt to deceive the police. *See Sanderson,* 169 S.W.3d at 165; *State v. Farris,* 125 S.W.3d 382, 388 (Mo.App.W.D.2004). Most importantly, Defendant's first name was listed on one of the two ledgers found in the cab of the truck. Agent Henry testified that in his experience, such documents are used to track expenses while transporting drugs, and the amounts listed on the ledgers were consistent with the rate for transporting drugs, not produce. No challenge to the admissibility of that opinion testimony was raised by Defendant, and our standard of review requires us to disregard Defendant's alternative explanation for the ledgers as the inference it relies on is contrary to the jury's verdict.

The evidence before the jury, viewed in the light most favorable to its verdict, was sufficient to prove beyond a reasonable doubt that Defendant had knowledge of and control over the drugs seized from his truck. Point II is denied, and the judgment of the trial court is affirmed.

JEFFREY W. BATES, P.J. and GARY W. LYNCH, J., concurs.

witness's testimony when considered with the other evidence presented in the case. *Id.*