STATE of Missouri, Respondent,

v.

Terrance WREN, Defendant/Appellant.

No. ED 92962.

Missouri Court of Appeals,
Eastern District,
Division Four.

May 18, 2010.

Motion for Rehearing and/or Transfer to
Supreme Court Denied June 29, 2010.

Application for Transfer Denied
Aug. 31, 2010.

Gwenda Renee' Robinson, St. Louis, MO, for appellant.

Chris Koster, Atty. Gen., Shaun J. Mackelprang, Jefferson City, MO, for respondent.

GARY M. GAERTNER, JR., Judge.

*Introduction*

Terrance Wren (Defendant) appeals from the trial court's judgment entered

upon a jury verdict convicting him of the class A felony of murder in the first degree, in violation of Section 565.020 [1]; two counts of armed criminal action, in violation of Section 571.015; five counts of the class A felony of unlawful use of a weapon, in violation of Section 571.030; and one count of the class A felony of assault in the first degree, in violation of Section 565.050. We affirm.

### *Factual and Procedural Background*

Defendant challenges the sufficiency of the evidence to support his conviction. As pertinent to Defendant's points on appeal, the evidence, viewed in the light most favorable to the verdict, reveals as follows.

On January 30, 2008, Keith Taylor (Taylor) and Roscoe Jefferson (Jefferson) were walking south on Sarah Street toward St. Louis Avenue in the City of St. Louis at around 3:30 p.m. This neighborhood block included St. Louis Avenue, North Sarah Street, East Maffit Avenue, and Laba die Avenue. As they walked, Taylor heard approximately five gunshots; the sound of the gunshots caused Taylor to believe two guns were being discharged. As he and Jefferson stood in front of Sarah's Chicken and Waffles at the intersection of Sarah and St. Louis Avenue, Taylor saw a "tannish" four-door Intrepid with tinted windows and small rims slowly turning right on Sarah from the corner of St. Louis Avenue. Taylor saw two muzzle flashes coming from the car. The Intrepid pulled up slowly to within ten feet of Taylor and Jefferson. The car's front passenger had a "low cut," a goatee, and was wearing a fuzzy black skull cap and a black hoody. The driver of the Intrepid had dreadlocks. Taylor could not see the passenger sitting in the backseat of the Intrepid.

As the car slowly rolled by Taylor, he saw the Intrepid's front passenger raise his hand out of the open front window. The rear passenger window was rolled down only halfway. The front passenger then stuck his head out of the window, pointed a black gun directly at Taylor, and started shooting as the car rolled slowly by Taylor. The back passenger also was shooting a gun. Taylor heard at least seven or eight gunshots. After the shooting began, Taylor tried to run behind a car, but a bullet hit him in his right thigh, and he fell in the middle of St. Louis Avenue where he ran to flag down help. When Jefferson attempted to help Taylor, he was shot in the back. The bullet entered Jefferson's lung. Although Jefferson saw two people in a white or beige car out of the corner of his eye, he did not see anyone shooting.

As Taylor lay in the street, he saw a red car crash into another car. Taylor attempted to get up, and he saw that the Intrepid had driven around the block and was turning on to St. Louis Avenue from Whittier Avenue. Taylor again heard gunshots, and he could see muzzle flashes coming from the Intrepid as it drove down St. Louis Avenue toward Sarah Street. Taylor heard only two guns firing that day, and he did not see anyone else firing a weapon in the area.

Taylor sought help and was eventually taken to a hospital where he was treated for a gunshot wound to his right thigh. He underwent surgery to repair the wound, which left a scar on his right thigh. Jefferson's injury also required a hospital stay and surgery, and Jefferson retained scars from the injury.

The next day, Taylor was taken to the police station, where he identified a vehicle as being the one involved in the drive-by

---

1. All statutory citations are to RSMo 2000, unless otherwise indicated.

shooting. When shown a photographic line-up, Taylor tentatively identified Defendant as the front passenger in the Intrepid who shot him. When he later viewed a live line-up, Taylor identified Defendant as the person who shot him, telling the detectives that he was one hundred percent certain of his identification. During trial, Taylor again identified Defendant as his shooter, stating that he did not have any doubt that Defendant was the front passenger who fired shots at him.

Rosalee Parks (Parks) was a backseat passenger in a red Mazda driven on St. Louis Avenue by Julia Steele (Steele) on January 30, 2008. Steele was driving Parks home from the Lumiere casino around 3:30 p.m. that afternoon. When Steele and Parks reached the intersection of St. Louis Avenue and Sarah, bullets entered the front seat of the car, striking Steele. Steele sustained a gunshot wound to the left side of her head, which resulted in her death. Parks, who was sitting behind Steele, ducked down and did not see who was shooting. Glass shattered, and some entered the back seat, striking Parks. When Parks looked up, Steele was leaning over. The car Steele was driving crashed into a green Camry. After the accident, Parks was treated at a hospital for fractured ribs and a fractured right leg. As a result of the crash, Steele additionally sustained rib fractures, a lacerated spleen, and a fractured right forearm.

Carlos Robinson (Robinson), who was visiting his cousin's apartment at 4138 St. Louis Avenue on January 30, 2008, heard the sound of a car accident at about 3:30 p.m., and went outside to see what had happened. He saw that a red car had crashed into a green car on St. Louis Avenue. A few minutes later, Robinson heard gunshots close to him, so he turned around and started to run. A bullet grazed his back, but Robinson did not see where the shot came from or who shot him. Robinson was treated for the gunshot graze in the emergency room.

Approximately eleven hours after the incident, the police recovered a gold Intrepid matching Taylor's description less than a mile from the scene. The Intrepid had been reported stolen the day before. Several items, including paperwork, were seized from the Intrepid for DNA and fingerprint analysis. The recovered paperwork included an envelope; the police lifted four fingerprints from the envelope, which were determined to be Defendant's.

Numerous bullets, bullet fragments, .45 automatic shell casings, and nine-millimeter caliber cartridge casings were recovered from the scene of the shooting. The St. Louis Police Evidence Technician officer who preserved and collected evidence from the crime scene testified that the area consisted of a two-lane street, with numerous occupied houses. The street was littered with broken glass, and several buildings and cars had been struck by bullets. After Steele had been shot, her Mazda had traveled to the wrong side of the road before crashing into the Camry. The Camry had also been struck by a .45 caliber copper jacketed bullet, which was recovered from its trunk. Testing performed on a nine-millimeter cartridge casing recovered from the Intrepid revealed that it had been fired from the same firearm as had the nine-millimeter cartridge casings recovered from the scene of the shooting. Defendant was subsequently interviewed by the police in connection with the investigation of Steele's death.

During a police interview on February 1, 2008, Defendant told the detective he had spent the afternoon of January 30 driving around with his girlfriend, first visiting his mother's house, which was within a quarter of a mile from the intersection of St. Louis Avenue and Sarah, and eventually

going to a White Castle restaurant and to the Lumiere Casino. Defendant stated that he and his girlfriend had also traveled to his girlfriend's brother's home on the south side of St. Louis to look at a car stereo. When he was shown a photograph of the Intrepid and told that his fingerprints had been recovered from an item found in the car, Defendant said that the fingerprints were not his and that he did not know anything about a gold Intrepid.

At Defendant's request, the police again interviewed Defendant on February 3, 2008. Defendant indicated he wanted to talk about who had been inside the Intrepid and to discuss his innocence. During this interview, Defendant said that, although most of what he had previously told the police was true, Defendant had not told the police that his cousin Jeremy Lewis (Jeremy) had called him on his cell phone to ask Defendant to pick him up at Robert Davis's house on St. Louis Avenue, between Whittier and Labadie. Defendant stated that when Jeremy came out to Defendant's car, Marquis Davis (Marquis) was with him, and Marquis told Defendant that he had a CD player he would sell to Defendant. Jeremy and Marquis directed Defendant to drive to the 4200 block of Maffit Avenue, where Marquis retrieved a box from the truck of the gold Intrepid with tinted windows. Defendant said when he opened the box, however, it contained an old radio and not the CD player pictured on the box, so he got his money back from Marquis.

When the police told Defendant that his explanation did not account for his fingerprints being found inside the Intrepid, Defendant responded that he had been lying, but was ready to tell the whole story. In his third statement, also given on February 3, Defendant said that when they reached Maffit, Marquis Davis pointed out the Intrepid and told Defendant that he

got it the night before. Marquis Davis then got into the Intrepid and drove it to the house of Jeremy's cousin, who lived in the 4400 block of Cote Brilliante. Defendant and Jeremy followed the Intrepid. When Marquis parked the Intrepid behind the cousin's house, he brought out the box containing the old radio and sold it to Defendant. Defendant stated that, after he discovered the box did not contain a CD player, Defendant started rummaging through the trunk, glove box, and interior of the Intrepid. After he retrieved his money from Marquis, Defendant and his girlfriend drove around to pass the time. Shortly after 2:00 p.m., however, Defendant received a phone call from another cousin, Jerrell Lewis (Jerrell), who asked Defendant to pick him up at the intersection of McMillan and Taylor. Defendant said he then picked up Jerrell; thereafter, they traveled to a McDonald's on Lindell and a small Amoco station on Laclede and Boyle, before dropping Jerrell off in the 4400 block of Cote Brillante.

At the close of its case, the State indicated its understanding that Defendant would be calling Jeremy and Jerrell as witnesses, and requested to be allowed to ask Jeremy on cross-examination whether he, his cousin Jerrell, and Defendant were documented members of the North Market Gangsters to show their bias and willingness to testify for Defendant. Defendant objected to any mention of gang membership involving his witnesses, arguing that no evidence had been presented showing the shooting was gang related, and that bias could be shown through the witnesses' family relationship to Defendant. Defendant further argued that evidence of gang relations constituted inadmissible character evidence, and that its prejudicial effect outweighed any probative value. The trial court ruled that the State could ask about the witnesses' mutual gang membership,

but could not inquire any further after receiving their initial answer.

Jeremy testified on Defendant's behalf at trial. According to Jeremy, after he and Defendant followed the Intrepid driven by Marquis to Cote Brillante, they then followed Marquis to Jeremy's backyard in the 4400 block of Garfield, where Defendant and Marquis searched the Intrepid for a CD player. When the search did not reveal a CD player in the Intrepid, Jeremy and Defendant got back into Defendant's Cutlass Supreme, and Defendant dropped Jeremy off at a store called JB Liquors. Jeremy testified that he saw Defendant "all day off and on" because Defendant was riding around the neighborhood in the Cutlass with Defendant's girlfriend and their newborn son.

During cross-examination, Jeremy further testified that he had observed Defendant driving the Cutlass around the neighborhood that afternoon about ten times, "probably every ten or twenty minutes." The following exchange occurred when the State questioned Jeremy as to why he had not previously volunteered the information that would account for Defendant's whereabouts on the day of the shooting, despite Jeremy's awareness that Defendant had been accused of being the shooter.

[State]: You don't say anything to anybody; right?

[Jeremy]: No.

\* \* \*

[State]: And you've been locked up since July; correct?

[Jeremy]: Yes.

[State]: You haven't written any letters?

[Jeremy]: No.

[State]: Are you, in fact, with the defendant's family?

[Jeremy]: No.

[State]: Isn't his family your family?

[Jeremy]: Yes.

[State]: You guys are cousins?

[Jeremy]: Yes.

[State]: You guys are more than cousins. You, the defendant, and your brother, Jerrell Lewis, are all documented members of the North Market Gangsters, isn't that true?

[Defense Counsel]: Objection, your Honor.

[Court]: That will be overruled.

[State]: Isn't that true, sir?

[Jeremy]: Yes.

Defendant submitted instructions for assault in the second degree and armed criminal action in connection with assault in the second degree, but the trial court refused these proposed instructions. The refused instruction for assault in the second degree provides as follows:

As to Count IV, if you do not find the defendant guilty of assault in the first degree as submitted in Instruction No. _____, you must consider whether he is guilty of assault in the second degree as submitted in this instruction.

As to Count IV, if you find and believe from the evidence beyond a reasonable doubt:

First, that at about 3:30 p.m. on January 30, 2008, at or near 4100 St. Louis Avenue, in the State of Missouri, the defendant recklessly caused physical injury to Keith Taylor by means of discharge of a firearm, then you are instructed that the offense of assault in the second degree has occurred, and if your further find and believe from the evidence beyond a reasonable doubt:

Second, that with the purpose of promoting or furthering the commission of that assault in the second degree, the defendant acted together with or aided other persons in committing the offense,

then you will find the defendant guilty of assault in the second degree under this instruction.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense under this instruction.

A person acts "recklessly" as to causing physical injury if he consciously disregards a substantial and unjustifiable risk that his conduct will result in physical injury and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation.

MAI–CR3d 319.12

During the jury instruction conference, Defendant argued that there were facts supporting the submission of his proposed assault-in-the-second-degree instruction because Taylor's injury was not of a serious nature, as alleged in the first-degree assault instruction. In response, the State argued that there was no evidence that the physical injury was recklessly caused because Taylor testified that Defendant aimed and shot at him and numerous bullet holes were found in the area where Taylor was shot. The trial court noted that the only testimony concerning the assault was provided by Taylor when the court refused the instruction. Regarding the shooting of Steele, instructions for both murder in the first degree and murder in the second degree were submitted to the jury.

The jury returned its verdict convicting Defendant of one count of murder in the first degree; two counts of armed criminal action; five counts of unlawful use of a weapon; and one count of assault in the first degree. Defendant's Motion for Acquittal or in the Alternative for a New Trial was denied.

This appeal follows.

*Points on Appeal*

In his first point, Defendant claims the trial court clearly erred in overruling his motion for judgment of acquittal at the close of all the evidence because the evidence was insufficient to support Defendant's convictions as to Count I of murder in the first degree; Count II of armed criminal action; and Counts III, VII, VIII, and IX of unlawful use of a weapon, in that the State failed to prove beyond a reasonable doubt that Defendant was one of the persons who committed the offenses, or that he acted together with or aided others in committing the offenses.

In his second point, Defendant claims the trial court clearly erred in overruling his motion for judgment of acquittal at the close of all the evidence because the evidence was insufficient to support Defendant's convictions as to Count I of murder in the first degree and the associated Count II of armed criminal action, as the State failed to prove beyond a reasonable doubt that Defendant acted with the conscious purpose of causing Ms. Steele's death. Defendant argues the State's evidence did not show that Defendant, or others with whom he allegedly acted, knew of, or were aware of Ms. Steele's presence when the shooting that caused her death occurred.

In his third point, Defendant claims the trial court clearly erred and abused its discretion in refusing to submit his proposed instructions for assault in the second degree, and armed criminal action in connection with assault in the second degree, because the evidence provided a basis for acquittal of assault in the first degree and conviction of the lesser-included offense of assault in the second degree, as a reasonable jury could have found that Defendant or others acting with him recklessly

caused physical injury to Mr. Taylor by means of discharge of a firearm.

In his fourth point, Defendant claims the trial court clearly erred and abused its discretion in overruling his objection to cross-examination of defense witness Jeremy Lewis about his gang affiliation with Defendant because this questioning permitted the State to introduce improper character evidence that was more prejudicial than probative.

### Standard of Review

■■■ We review the denial of a motion for judgment of acquittal to determine whether the state adduced sufficient evidence to make a submissible case. *State v. Sears,* 298 S.W.3d 561, 563 (Mo.App. E.D. 2009). When presented with a challenge to the sufficiency of the evidence, we review to determine whether there is sufficient evidence from which a reasonable juror could have found the defendant guilty beyond a reasonable doubt. *State v. Whalen,* 49 S.W.3d 181, 184 (Mo. banc 2001). We view the evidence in the light most favorable to the State, drawing all reasonable inferences in its favor. *Id.* We disregard contrary inferences, unless they are such a natural and logical extension that no reasonable juror would be able to disregard them. *Id.*

■■■ The refusal to submit a tendered jury instruction is within the trial court's discretion. *State v. Leisure,* 810 S.W.2d 560, 574 (Mo.App.1991).

■■■ Trial courts are afforded broad discretion in determining the permissible scope of cross-examination. *State v. Oates,* 12 S.W.3d 307, 312 (Mo. banc 2000). We will not reverse a criminal conviction absent an abuse of discretion. *Id.*

### Discussion
### Point I

In his first point, Defendant claims the trial court clearly erred in overruling his motion for judgment of acquittal at the close of all the evidence because the evidence was insufficient to support Defendant's convictions as to Count I of murder in the first degree; Count II of armed criminal action; and Counts III, VII, VIII, and IX of unlawful use of a weapon, as the State failed to prove beyond a reasonable doubt that Defendant was one of the persons who committed the offenses, or that he acted together with, or aided, others in committing the offenses. Defendant argues that the victims of these offenses were unable to identify their shooter, and that the State failed to prove identity through firearms evidence, DNA evidence, fingerprint evidence, or other testimony.

The verdict director for first-degree murder submitted to the jury required the jury to find that Defendant acted together with or aided other persons in causing the death of Steele by shooting her after deliberation on the matter. Because Defendant was tried on a theory of accomplice liability, the jury did not have to find that Defendant personally performed each act constituting first-degree murder, only that Defendant acted together with or aided another either before or during the commission of the crime, with the purpose of promoting the crime. *State v. Ferguson,* 20 S.W.3d 485, 497 (Mo. banc 2000).

In reviewing Defendant's challenge to the sufficiency of proof establishing his identity, we view the evidence most favorably to the State, and draw all inferences in its favor. *Whalen,* 49 S.W.3d at 184. There was direct evidence from Taylor who testified that Defendant was the individual in the front seat of the Intrepid shooting a gun during the three bursts of gunfire at St. Louis Avenue and Sarah, at

the time Steele was shot and killed, approximately 3:30 p.m. Ballistics testing of nine millimeter cartridge casings recovered from the scene showed that they were fired from the same gun that fired a nine millimeter cartridge casing recovered from the Intrepid. Taylor testified that he heard only two guns firing during the incident, that he saw two guns being fired from the Intrepid, and that he saw no one else firing a weapon in the area.

 "The testimony of a single witness is sufficient to establish the identity of a defendant if the jury believes it beyond a reasonable doubt." *State v. Barnes*, 917 S.W.2d 606, 607 (Mo.App. E.D.1996). Here, the testimony of Taylor, an eye witness to the shooting incident is sufficient to support inferences which, in turn, support the verdict. There was both direct and circumstantial evidence that, at approximately 3:30 p.m. on January 30, 2008, Defendant and another individual were firing guns from the Intrepid as their car slowly drove by the location where Steele was shot and killed, and that no one else was on the street shooting at the time Steele was shot and killed. *Id.*; *Whalen*, 49 S.W.3d at 184. Thus, the evidence was sufficient to establish Defendant or his co-actor fired multiple shots at Steele during the commission of the crime, thus establishing identity for purposes of the elements of Count I of murder in the first degree and Count II of armed criminal action.

 Counts III, VII, VIII, and IX of unlawful use of a weapon were submitted to the jury in connection with the injuries suffered by Steele, Jefferson, Parks, and Robinson. The submitted verdict directors for these counts required the jury to find that Defendant or other persons knowingly shot a firearm from the Intrepid, and that as a result, these victims suffered injury or death. All four of these victims were injured in the same vicinity and during the same time frame as were Steele and Taylor; thus, our analysis for Counts I and II concerning the evidence of Defendant's identity as one of the individuals Taylor observed firing a gun from the Intrepid as it drove applies equally to Defendant's challenge to the unlawful-use-of-a-weapon counts. The evidence was sufficient to establish Defendant or his co-actor fired multiple shots from the Intrepid and that, as a result of this conduct, Steele, Parks, Jefferson, and Robinson were injured. *Barnes*, 917 S.W.2d at 607. Thus, sufficient evidence established Defendant's identity for purposes of Counts III, VII, VIII, and IX.

The trial court did not clearly err in overruling Defendant's motion for judgment of acquittal at the close of all the evidence because the evidence was sufficient to support Defendant's convictions as to Count I of murder in the first degree; Count II of armed criminal action; and Counts III, VII, VIII, and IX of unlawful use of a weapon.

Point denied.

### Point II

In his second point, Defendant claims the trial court clearly erred in overruling his motion for judgment of acquittal at the close of all the evidence because the evidence was insufficient to support Defendant's convictions as to Count I of murder in the first degree and the associated Count II of armed criminal action, as the State failed to prove beyond a reasonable doubt that Defendant acted with the conscious purpose of causing Ms. Steele's death. Defendant argues the State's evidence did not show that Defendant or others with whom he allegedly acted knew of, or were aware of Ms. Steele's presence when the shooting that caused her death occurred. Defendant argues that this

Court must reverse Defendant's convictions on Counts I and II and discharge him, claiming that the trial court's ruling violated his right to due process of law.

■ In considering whether sufficient evidence supported the jury's verdict, we consider each of the elements of the charged crime. *State v. Grim*, 854 S.W.2d 403, 411 (Mo. banc 1993). Viewing the evidence in the light most favorable to the State, and granting the State all reasonable inferences from the evidence, we consider whether a reasonable juror could find each of the elements beyond a reasonable doubt. *Id.*

"A person commits the crime of murder in the first degree if he knowingly causes the death of another person after deliberation upon the matter." Section 565.020. As previously discussed, the verdict director submitted to the jury required the jury to find that Defendant acted together with or aided other persons in causing the death of Steele by shooting her after deliberation on the matter. Consequently, to convict Defendant of murder in the first degree, the jury had to find that he or another person knowingly caused the death of Steele, after deliberation on the matter. *Ferguson*, 20 S.W.3d at 497.

■ Defendant need not have personally performed each act constituting the crime's elements, but in order to be responsible for the other person's acts, he must have acted together with or aided that person either before or during the commission of the murder, with the purpose of promoting the crime. *Id.* To be convicted as an accomplice, Defendant must have personally deliberated upon the murder. *Id.* Deliberation is "cool reflection upon the matter for any length of time, no matter how brief." Section 565.002(3). Generally, deliberation is proved through the circumstances surrounding the crime. *Ferguson*, 20 S.W.3d at 497.

■ Defendant claims the State failed to prove that he acted with the conscious purpose of causing Steele's death because the evidence did not show that Defendant or another with whom he acted knew of, or were aware of, Steele's presence when she was shot and killed. Defendant further argues that the evidence failed to demonstrate a motive for shooting Steele, to show her murder was premeditated or planned, or to prove Steele knew Defendant. Defendant's argument that the State showed no motive for the shooting of Steele is irrelevant as the State is not required to prove motivation. *See State v. Randolph*, 698 S.W.2d 535, 540 (Mo.App. E.D.1985).

The jury was instructed on both first-degree murder and murder in the second degree. The element of deliberation distinguishes these two offenses. *State v. Beal*, 966 S.W.2d 9, 12 (Mo.App. W.D. 1997). The record provides sufficient evidence for the jury to find beyond a reasonable doubt that Defendant deliberated. The circumstances surrounding the crime amply establish deliberation: Defendant and another shooter fired multiple shots at street level from the slowly-moving Intrepid, striking multiple victims in a neighborhood block, with time elapsing between three separate bursts of gunfire from their guns. Defendant aimed point-blank at Taylor, firing several shots. "The culpable mental state necessary for a homicide offense may be found to exist if the only difference between what actually occurred and what was the object of the offender's state of mind is that a different person or persons were killed." Section 565.003. Thus, even if the jury believed that Defendant did not intend to kill Steele, but rather, did so when firing at Taylor, his cool reflection upon shooting Taylor sup-

plies the necessary culpable mental state for murder in the first degree.

Although Defendant attempts to argue that the evidence did not show that he knew of or was aware of Steel's presence when the shooting that caused her death occurred, we find his argument specious. A person acts with knowledge with respect to his conduct or to attendant circumstances when he is aware of the nature of his conduct or that certain circumstances exist. Section 562.016.3(1). As well, an individual acts knowingly when he is aware that his conduct is practically certain to cause a result. Section 562.016.3(2). From the evidence adduced, it is reasonable to infer that Steele was shot during the first or second burst of gunfire as she approached the Intrepid at the intersection of Sarah and St. Louis Avenue, and that the red Mazda she was driving was clearly visible to the occupants of the Intrepid as they opened fire. Evidence that a murder was committed by means of a deadly weapon and that an accomplice was aware that the deadly weapon was to be used in the commission of a crime is a circumstance permitting the inference of accessory liability for first degree murder. *State v. Gray,* 887 S.W.2d 369, 376–77 (Mo. banc 1994).

Moreover, the impact when Steele's car crashed made a noise loud enough to be heard by Robinson inside a building; consequently, the accident, which occurred when Steele's car crashed into parked cars on the opposite side of the street, could hardly go unnoticed by Defendant as he slowly rode by in the Intrepid. Nor can Defendant claim ignorance of Taylor's injury, given Taylor's prone body in the middle of St. Louis Avenue. Yet, Defendant and his co-shooter returned to the scene of mayhem they created—not to render help—but to open fire yet again. Accomplice deliberation has also been found to exist where there is evidence that the accomplice either participated in the homicide or continued in the criminal enterprise after it was apparent that a victim was to be killed. *Id.*

The jury's determination that Defendant knew that the moving car was occupied when he shot into it is supported by the evidence. "Deliberation requires only a brief moment of 'cool reflection' and may be inferred from the fact that a defendant had the opportunity to terminate an attack after it began." *State v. Donahue,* 280 S.W.3d 700, 704 (Mo.App. W.D.2009) (finding deliberation where defendant fired five to six shots into parking lot, stopping to "unjam" weapon between shots) (internal quotations and citation omitted). Significantly, Defendant and his co-shooter did not satisfy themselves with one pass by the victims; they returned to the scene only moments after Taylor was wounded, and opened fire again. Defendant's conduct after the murder also supports a finding of deliberation. *State v. Tisius,* 92 S.W.3d 751, 764 (Mo.2002).

The trial court did not err in overruling Defendant's motion for judgment of acquittal. The evidence supports a verdict that Defendant deliberated and knowingly took actions practically certain to kill Steele.

Point denied.

### Point III

In his third point, Defendant claims the trial court clearly erred and abused its discretion in refusing to submit his proposed instructions for assault in the second degree, and armed criminal action in connection with assault in the second degree, because the evidence provided a basis for acquittal of assault in the first degree and conviction of the lesser-included offense of assault in the second degree, as a reasonable jury could have found that Defendant

or others acting with him recklessly caused physical injury to Mr. Taylor by means of discharge of a firearm. Defendant argues that the trial court's refusal violated his rights to due process of law, to present a defense, and to a fair trial and asserts that this Court must reverse Defendant's convictions on Counts IV and V and remand for a new trial.

 Trial courts are not required to instruct on lesser included offenses unless a basis exists for the jury to acquit the defendant of the charged offense and convict him of the lesser offense. *State v. Hibler*, 5 S.W.3d 147, 148 (Mo. banc 1999). "A person commits the crime of assault in the first degree if he attempts to kill or knowingly causes or attempts to cause serious physical injury to another person." Section 565.050. In contrast, a person commits assault in the second degree when he recklessly causes physical injury to another by discharging a firearm. Section 565.060.5 A person acts recklessly if he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow from his action. Section 562.016.4.

 To acquit Defendant of assault in the first degree here, the jury needed to reasonably doubt whether he attempted to kill, or knowingly caused, or attempted to cause, serious physical injury to Taylor. *Hibler*, 5 S.W.3d at 148–49. Taylor testified that, after the Intrepid slowly pulled up to within ten feet of Taylor, Defendant stuck his head out of the Intrepid's front passenger window, pointed a black gun directly at Taylor, and started shooting. A passenger in the back seat of the Intrepid was also shooting a gun. Although Taylor tried to run for cover, a bullet stuck him in his right thigh. The gunshot wound Taylor sustained from the shooting required hospitalization and surgery, and left a permanent scar; thus, no reasonable jury

could have concluded that Taylor did not suffer a serious physical injury. Given Defendant's close proximity to Taylor and Defendant's direct aim at Taylor while shooting multiple rounds of ammunition, a jury could not reasonably doubt that Defendant attempted to kill or cause serious physical injury to Taylor; nor could it conclude that Defendant's actions were merely reckless.

 An individual is guilty of purposely causing or attempting to cause physical injury to another when that individual consciously engages in conduct that causes such injury. *Whalen*, 49 S.W.3d at 187. Accordingly, there was no basis here for acquittal of assault in the first degree and conviction of the lesser offense. *Hibler*, 5 S.W.3d at 148–49. "Where proof of defendant's guilt is strong, where the evidence clearly indicates the commission of the more serious crime, and where there is no evidence to support an adverse finding on an element of the charged crime, it is not necessary to instruct on a lesser included offense." *State v. Toran*, 878 S.W.2d 913, 914 (Mo.App. E.D.1994). The trial court did not clearly err or abuse its discretion in refusing to submit Defendant's proposed instructions for assault in the second degree, and armed criminal action in connection with assault in the second degree.

Point denied.

### Point IV

 In his fourth point, Defendant claims the trial court clearly erred and abused its discretion in overruling his objection to cross-examination of defense witness Jeremy Lewis about his gang affiliation with Defendant because this questioning permitted the State to introduce improper character evidence that was more prejudicial than probative. Defen-

dant asserts that there is a reasonable probability that the jury would have reached a different conclusion about his guilt, if the trial court had prohibited this line of cross-examination. Defendant argues that the trial court's ruling violated his rights to due process of law, to be tried only on the charged offenses, and to a fair trial, and he claims this Court must reverse his convictions and remand for a new trial.

 We afford the trial court broad discretion in determining the permissible scope of cross-examination, and will not reverse a criminal conviction absent an abuse of that discretion. *Oates,* 12 S.W.3d at 313. Evidence of a defendant's affiliation with a gang is normally improper character evidence. *Beal,* 966 S.W.2d at 13. "Such evidence, however, may be probative and admissible if it tends to prove a motive for the crime, *the possible bias of defense witnesses who are shown to be members of the defendant's gang,* a common design or purpose in crimes committed by a group, or the identification of the defendant." *Id.* (emphasis ours). Here, evidence of Defendant's and Jeremy's gang membership was solicited by the State during cross-examination to demonstrate Jeremy's bias in providing a belated alibi for Defendant and, as such, was probative and admissible. The trial court limited the State's cross-examination to only a brief acknowledgment by Jeremy of his and Defendant's mutual gang affiliation, and did not include any follow-up questioning, or solicitation of information concerning gang activity. The trial court did not abuse its discretion in overruling Defendant's objection to cross-examination of defense witness Jeremy Lewis concerning his gang affiliation with Defendant. *Oates,* 12 S.W.3d at 313.

Point denied.

*Conclusion*

The judgment of the trial court is affirmed.

KURT S. ODENWALD, P.J., and GEORGE W. DRAPER III, J., concur.