STATE of Missouri, Respondent,

v.

Reggie Lynn HARRELL, Appellant.

No. SD 31343.

Missouri Court of Appeals,
Southern District,
Division Two.

May 16, 2012.

Emmett D. Queener, Columbia, for Appellant.

J. Daniel Patterson, Greene County Prosecuting Attorney, D. Clayton Ballard, Asst. Prosecuting Attorney, Springfield, for Respondent.

WILLIAM W. FRANCIS, JR.,
Presiding Judge.

Reggie Lynn Harrell ("Harrell") appeals his conviction for receiving stolen property. Harrell claims there was insufficient evidence to establish he knew or believed he had nine stolen video games in his possession. Finding no merit to Harrell's appeal, we affirm the trial court's judgment.

## Factual and Procedural History

Harrell was charged by information with a class A misdemeanor of receiving stolen property in violation of section 570.080.[1] Specifically, the information alleged that on or about November 23, 2009, in Greene County, Missouri, "[Harrell], with the purpose to deprive the owner of nine (9) video games, received such property, knowing or believing that they had been stolen." A bench trial was held on October 14, 2010. Viewed in the light most favorable to the trial court's judgment, the evidence adduced at trial revealed the following.

On November 23, 2009, Harrell drove his van to a Kmart store. Harrell's passengers included Mike Housley ("Housley"), Austin Vicknair ("Vicknair"), and another man identified only as "Terrance." Housley and Vicknair went inside Kmart while Harrell and Terrance remained in the van. Nathanial Sanchez ("Sanchez"), the loss prevention manager for Kmart, suspected Housley and Vicknair were stealing video games. Sanchez observed each grab a handful of video games from the electronics department. Housley walked to the sporting goods department, concealed the video games in his pants, and went into the restroom where he remained for fifteen to twenty minutes. During that time, Sanchez stood outside the restroom door and could hear the rustling of cellophane, as if Housley was opening the video games. After Housley exited the restroom, Sanchez went inside the restroom, observed the cellophane wrappers in the trash can, but did not find the video games. Sanchez followed Housley to the front of the store, at which time Housley exited the store and Sanchez confronted him on the sidewalk. Housley did not have the video games with him—he told Sanchez he had left them in the restroom.

---

1. All statutory references are to RSMo Cum. Supp.2009, unless otherwise indicated.

Sanchez then escorted Housley to the loss prevention office and contacted the Springfield Police Department; Officer Daniel Rankey[2] ("Officer Rankey") responded. Upon his arrival at Kmart, Officer Rankey was approached by Harrell in the atrium. Harrell asked Officer Rankey if he was there regarding Harrell's roommate, Housley. Officer Rankey indicated Harrell was worried as to why his roommate had been gone so long. Officer Rankey instructed Harrell to remain in the atrium and he would be back to speak with him regarding Housley. Officer Rankey then went to the loss prevention office and spoke to Sanchez about the alleged theft. Officer Rankey subsequently returned to the front of the store to speak with Harrell, but Harrell had left the atrium and was sitting in his van with two other men. Officer Rankey then went out to Harrell's van and told Harrell that Housley was the individual involved in a theft investigation and that it would be ten to fifteen minutes before he would be done with the investigation. Officer Rankey also informed the three men that there was a second suspect in the theft. Immediately, Harrell's demeanor changed and he became defensive, and offered to let Officer Rankey search the van but Officer Rankey declined because there was no back-up officer available.

During Officer Rankey's conversation with Harrell at the van, Officer Rankey observed some suspicious, furtive movements coming from the passenger in the rear of the van. This passenger was later identified as Vicknair, the second suspect in the theft. Because of these movements, Officer Rankey returned to the atrium of the store and continued to watch the van. Officer Rankey observed Vicknair pass a large bag from the backseat to Harrell in the front seat. After handing the bag to Harrell, Vicknair exited the van.

After Vicknair exited the van, Officer Rankey questioned Vicknair further on the theft, and Vicknair "implicate[d] himself in the theft [of the video games]." Sanchez came to the front of the store and confirmed that Vicknair was the second suspect. By that time, a back-up officer had arrived.

Officer Rankey re-initiated contact with Harrell, who was still in the van. Officer Rankey asked Harrell for consent to search the van. Harrell was acting nervous and "attempting to distance himself from the actual incident[.]" Harrell initially limited Officer Rankey's search to the rear of the van. Officer Rankey told Harrell that he wanted to search the entire van and Harrell reluctantly agreed. Based on Officer Rankey's training and experience, Officer Rankey felt that Harrell was attempting to hide something from him by trying to limit the search of the van.

During the search of the van, Officer Rankey observed a blue-colored backpack protruding from underneath the front of the driver's seat. Officer Rankey asked who the backpack belonged to and Harrell said it was his. Officer Rankey informed Harrell he was going to open the backpack and "merely peer inside." As Officer Rankey began to reach down toward the backpack, Harrell quickly grabbed the backpack—pulling it from underneath the seat—and began unzipping smaller compartments on the backpack. As Harrell unzipped the smaller compartments, he removed items and said, "This is mine. This is mine." Officer Rankey clarified that Harrell was pulling personal items out of the backpack and claiming ownership.

2. The transcript reflects the spelling of Officer Rankey's name as "Rainkey." However, the proper spelling is "Rankey," and is used throughout this opinion.

Harrell said, "It just has my stuff, my belongings." Officer Rankey noticed that Harrell was acting "extremely nervous" at this time, and Officer Rankey ordered Harrell to stop and give him the backpack. Harrell reluctantly gave the backpack to Officer Rankey, at which point Officer Rankey unzipped the top compartment, peered inside, and observed video games in the backpack. Sanchez compared the video games with the cellophane wrappers he found in the trash can in the restroom, and determined they were the nine video games stolen from Kmart.

Officer Rankey then placed Housley and Vicknair under arrest for stealing the video games and informed Harrell a report would be completed in reference to the investigation. At that point, Harrell began making spontaneous statements. Harrell said the backpack was not his, he had never seen the backpack before, and that the backpack must have been stolen with the video games because it appeared brand new. Officer Rankey indicated that Harrell became progressively nervous throughout the investigative process.

At trial, Harrell testified on his own behalf. He explained that after driving Vicknair and Housley to Kmart, he became worried when the two men were inside a long time. Harrell testified that when Officer Rankey arrived, Harrell approached him as he figured the officer was there for Housley because Housley had a "bad history" and got "in trouble all the time for stealing." Harrell testified that at some point, Vicknair came out of Kmart without Housley, got into the van, and said nothing. Harrell testified that the backpack underneath the driver's seat was not his, and that he was mistaken when he first claimed ownership of the backpack as he thought it was the bag he always kept underneath the driver's seat. Furthermore, Harrell explained that Vicknair must have stuffed the backpack underneath the driver's seat, from the back, without his knowledge. On cross examination, Harrell admitted he had a big duffel-style leather bag, which looked nothing like the backpack. Harrell acknowledged he never saw anyone place the backpack underneath the driver's seat, and he did not notice the backpack being pushed underneath the seat far enough so that it protruded out the front.

Harrell was then examined by the trial court. When the trial court inquired as to what happened when Vicknair exited the store and returned to the van, Harrell stated:

I didn't say nothing to him. I said—I asked him what took so long. And he was like I was waiting on blah, blah, blah. I didn't really pay no attention, because I knew the police was in the store. And I wasn't going to go off into the drills and all that, because he didn't—to me he didn't have nothing. I didn't think he had stole nothing. And evidently that's the one that had done it.

When the trial court further inquired as to why Harrell did not ask Vicknair what was going on, Harrell responded that he had asked Vicknair what was going on and Vicknair told him that Housley was still in the store. At that point, Harrell stated, "So I was like, well, he must be in there with the police, then, if he in there." Harrell suspected that the police came to Kmart because Housley was always in trouble for stealing. When asked about limiting the search of his van the second time, Harrell denied limiting the search.

The trial court took the matter under advisement. On October 21, 2010, the trial court found Harrell guilty of receiving stolen property. The trial court subsequently entered judgment and sentenced Harrell to 365 days in the Greene County Jail, suspended execution of sentence, and

placed Harrell on two years' supervised probation. This appeal followed.

Harrell's sole point relied on contends the trial court erred in imposing judgment and sentence in that the evidence was insufficient to support his conviction because the evidence failed to establish that Harrell knew or believed that he had nine stolen video games in his possession as charged. Thus, we determine whether there was sufficient evidence to conclude Harrell knew or believed he had nine stolen video games in his possession.

## Standard of Review

Our standard of review in a bench-tried case is the same as in a jury-tried case. *State v. Craig*, 287 S.W.3d 676, 681 (Mo. banc 2009). "When considering the sufficiency of the evidence on appeal, this Court must determine whether sufficient evidence permits a reasonable juror to find guilt beyond a reasonable doubt." *State v. Belton*, 153 S.W.3d 307, 309 (Mo. banc 2005). This Court must consider the evidence, together with all reasonable inferences drawn therefrom, in the light most favorable to the verdict, while disregarding all inferences to the contrary. *State v. Biggs*, 333 S.W.3d 472, 480 (Mo. banc 2011). "Even if the evidence would support two equally valid inferences, only the inference that supports the finding of guilt can be considered." *State · v. Latall*, 271 S.W.3d 561, 568 (Mo. banc 2008). The reliability, credibility, and weight of witness testimony are for the fact-finder to determine. *State v. Breedlove*, 348 S.W.3d 810, 814 (Mo.App. S.D.2011). It is within the fact-finder's province to believe all, some, or none of the witness's testimony in arriving at its decision. *Id.*

## Analysis

"A person commits the crime of receiving stolen property if for the purpose of depriving the owner of a lawful interest therein, he or she receives, retains or disposes of property of another knowing that it has been stolen, or believing that it has been stolen." § 570.080.1. Here, Harrell's sole issue raised in his brief is that the State did not present any evidence that supports Harrell knew or believed that the backpack contained the nine stolen video games. We, however, disagree.

"Because direct evidence of whether the defendant knew or believed the property was stolen is seldom available, circumstantial evidence is sufficient to prove this element of the offense." *State v. Shinkle*, 340 S.W.3d 327, 331 (Mo. App. W.D.2011). "A false statement given in explanation of the source of property by one possessing it is a factor inconsistent with the possessor's innocence and may be considered in determining if he had guilty knowledge." *State v. Loveall*, 105 S.W.3d 569, 572–73 (Mo.App. S.D.2003). "Suspicious conduct, deceptive behavior, and false statements can give rise to an inference of guilty knowledge by a defendant." *Id.* at 573.

First, the State presented extensive evidence of Harrell's suspicious conduct. This included Officer Rankey's testimony that Harrell initially offered to allow him to search the van; however, when Officer Rankey asked to search the van after Vicknair had returned and Officer Rankey saw Vicknair pass a bag to Harrell in the front seat, Harrell attempted to limit the search to the rear of the van, where the bag was not located. Officer Rankey testified that based upon his training and experience, he thought Harrell was attempting to hide something from him by limiting the search of the van. Officer Rankey also testified that throughout the investigation, Harrell was acting nervous, which progressively got worse.

In addition, Harrell acted deceptively after Officer Rankey found the backpack in that Harrell quickly grabbed the backpack out from underneath the seat while Officer Rankey was reaching for it. Then, Harrell identified the backpack as his, began opening the smaller compartments and removing items—identifying the items as his. Harrell said, "It just has my stuff, my belongings." After Officer Rankey instructed Harrell to stop, Harrell reluctantly gave the backpack to Officer Rankey. Officer Rankey then opened the top compartment of the backpack and saw the video games inside. Giving false statements to a police officer or behaving deceptively can give rise to an inference of guilty knowledge. *State v. Allen*, 817 S.W.2d 526, 528 (Mo.App. E.D.1991). Harrell subsequently changed his story after the stolen video games were discovered, even though Harrell had previously been holding the backpack, and identified the backpack and specific items inside as his.[3] Harrell then said that the backpack was not his, that he had never seen the backpack before, and that the backpack must have been stolen with the video games. In this context, inconsistent statements can demonstrate consciousness of guilt. *See State v. Taylor*, 691 S.W.2d 379, 382 (Mo.App.S.D.1985).

Harrell's testimony provided additional facts supporting a finding of guilt. Harrell admitted he knew the individuals he took to Kmart had a history of stealing. Harrell acknowledged he was aware that Housley and Vicknair were in trouble inside the store and he suspected the police were most likely there for Housley. While Harrell said he was "freaked out" when he learned Housley was detained in the store, his testimony portrayed an offhand conversation with Vicknair when Vicknair re-

turned to the van. Notably, Harrell said that he did not say much to Vicknair and did not pay attention to what Vicknair said at that time. The trial court specifically noted that it did not find Harrell's testimony "credible, or reasonable, or consistent as to his conversation with [Vicknair]." However, the trial court did find Officer Rankey's testimony credible.

Here, Harrell's suspicious conduct, deceptive behavior, and inconsistent statements provided sufficient circumstantial evidence from which a finder-of-fact could infer that Harrell knew or had reason to believe the nine video games were stolen. Accordingly, there was sufficient evidence from which the trier of fact could have found beyond a reasonable doubt that Harrell knew or believed the nine video games were stolen. Point denied. The trial court's judgment is affirmed.

BARNEY and SCOTT, JJ., Concur.

---

**3.** Further compounding the inconsistencies in Harrell's testimony, is the fact that Harrell also testified his big leather duffel-style bag looked nothing like the backpack.