DON E. BURRELL, J.
Patricia M. Halverson ("Defendant") was charged with attempted murder in the first degree and armed criminal action. See sections 565.020 and 571.015. Following a bench trial, the trial court found Defendant guilty of attempted second-degree murder and armed criminal action for shooting her husband ("Victim"). See sections 562.012, 565.021 and 571.015.[1] In three points, Defendant claims the trial court erred in overruling her "motion for verdict of acquittal ... at the close of all evidence" and finding her guilty of the two offenses because "there was no evidence of a culpable mental state."
Finding no merit in this claim, we affirm.
Standard of Review
"Our review of a trial court's denial of a motion for judgment of acquittal is limited to a determination of whether there is sufficient evidence from which a reasonable juror could have found the [d]efendant guilty beyond a reasonable doubt." State v. Curtis , 497 S.W.3d 381, 383 (Mo. App. E.D. 2016). In doing so, we "accept[ ]
*3 as true all favorable evidence to the State and all favorable inferences that can be drawn from the evidence, and disregard[ ] all contrary evidence and inferences." Id. "The sufficiency of the evidence in a court-tried case is determined by the same standard as in a jury-tried case." State v. Blair , 298 S.W.3d 38, 43 (Mo. App. W.D. 2009). Our following summary of the relevant evidence is presented in accordance with that standard.
Evidence and Procedural History[2]
Victim worked as an officer for the McDonald County Sheriff and had been a certified police officer for over thirty years. He had also worked at the fire department. When Victim returned home from work on December 1, 2015, Defendant said, " 'You're never going to get me that paper, are you?' " Defendant was referring to a military service form Victim had that Defendant thought might assist her in getting medical treatment for a stroke she had suffered about two months earlier that had left her "not ... as mobile as she" used to be. Victim told Defendant that he intended to retrieve it the next day from a storage unit.
Victim took his dog for a walk, then returned home for a nap, as was his usual after-work routine. Defendant was still at home when Victim returned and sat down in the living room to take his nap. Victim had his duty weapon on his person, and Defendant knew that Victim also kept a 9 mm handgun in a bedroom dresser.
Victim was awakened from his nap by what "felt like a firecracker [going] off in [his] mouth." Victim did not realize that he had actually been shot, but he saw blood running down his shirt. Victim asked Defendant to get a towel, and she "said, 'You are really sweating bad.' " Victim asked Defendant to call 9-1-1. Defendant said that she could not get her phone to work. When Victim told her to use his phone, Defendant said that her phone was working.
A corporal with the sheriff's department was dispatched to the scene, and he met Defendant on the back deck of the home. Defendant said that Victim "was inside and was bleeding from his mouth and nose." Defendant told the corporal that "she had been outside walking and heard a pop sound and went into the residence to check, and then located [Victim] in the chair bleeding." Defendant said she believed that Victim "had self-inflicted a gunshot and that he had been depressed and had a history of those types of things." The corporal noticed a firearm, and Defendant said "she had taken the firearm and put it on the barbecue grill" on the back deck.
Inside the house, a deputy noticed a wound to Victim's temple, and a 9 mm shell casing was subsequently recovered *4 from the floor of the living room. The corporal recognized Victim, and he told Victim that he had been shot. An emergency responder, who had worked with Victim at the fire department, also told Victim that he had been shot, and he asked Victim, " 'Why?' " Victim replied, " 'I didn't do this.' " Victim was transported from the scene to a hospital by helicopter, where he later learned that a bullet had gone in the right side of his head and traveled though his sinus, shattering the left side of his jaw.
A surgeon who treated Victim opined that, based upon the area around the entrance wound and "stippling[,]" the gun was not "up against the skin" when Victim was shot. Another treating surgeon determined that the bullet entered Victim's head at the right temple and proceeded at a 45 degree angle down through the roof of the mouth and lodged in the left mandible beneath the lower gum line. Given the injuries observed, the surgeon did not believe that the gunshot wound could have been self-inflicted.
The day after the shooting, Defendant was interviewed by a detective. Defendant said that she had been outside, and when she went inside, she then heard Victim "gurgling" and "breathing heavy[.]" Defendant did not mention having been alerted to anything when she was still outside the house. She told the detective that Victim was "bleeding out of his mouth and nose." Defendant said she was unable to "get out on her phone." She said that she picked up the gun from the floor beside Victim, put it outside on the barbeque grill, and called 9-1-1. Defendant maintained that Victim had shot himself because there was no one else at the house.
After the detective learned that the doctors did not think the gunshot could have been self-inflicted, he interviewed Defendant again. This time, Defendant said that she was listening to music on her phone outside and did not hear anything. She also said that when she picked up the gun, she first put it on the kitchen counter and then took it outside to the barbeque grill.
The detective interviewed Defendant a third time. This time, the detective informed Defendant that they were "finding no evidence that [Victim] shot himself." Defendant again insisted that she and Victim were the only people at the house. Defendant did not suggest that she had the gun "for whatever purpose and it accidentally discharged[.]"
After Defendant was jailed, she sent a letter to Victim. The letter was admitted into evidence, and Victim read from it at trial.[3] In the letter, Defendant stated, " 'I know things haven't been great.... Pray for me and forgive me.' " Near the end of the letter, Defendant stated, " 'They told me Christmas is ... next week. Oh, my gosh. Please don't leave me in here for Christmas. Please get me out, [Victim]. Please tell them this was not on purpose.' " At no prior time had Defendant told Victim that "the gun went off accidentally" or that she did not mean to shoot him.[4]
Defendant took the stand at trial and provided the following testimony. Just before the shooting happened, she had been talking with Victim about there being an armadillo in the yard. Defendant went to get the 9 mm pistol out of the drawer to shoot the armadillo, and she asked Victim "if the safety was on." Victim told her to bring the gun to him. Defendant did not remember what happened after that, but she did not remember holding the gun *5 when Victim was shot, and she did not think that she shot Victim.
On cross-examination, Defendant testified that she realized that she had shot Victim a "week or so" after the shooting. Defendant admitted that before Victim was shot, Defendant had shot both "semiautomatics and revolvers[,]" and she had passed a class on carrying concealed firearms that included instruction on "safeties" on guns.
After denying Defendant's motions for acquittal, the trial court found Defendant guilty of attempted second-degree murder and armed criminal action.[5] The trial court also stated "kind of what [it thought] happened" and described some of the evidence. The trial court's statements included the following:
There is an exchange about did you get the [military form]. He said, no, I will get it tomorrow.... Then he decided he would go ahead and take his nap as he did every day. At that point I think she decided-or snapped and said enough is enough. I'm not having any help. She goes and gets the gun and comes back and shoots him. She lays it-takes it out on the grill thinking he is going to die, and he doesn't die. She comes back in and he is still alive and calls 9-1-1. Then ... everybody shows up and we go from there. I don't really buy the armadillo story.
The trial court then sentenced Defendant to serve concurrent terms of ten years for attempted second-degree murder and three years for armed criminal action. This appeal timely followed.
Analysis
Each of Defendant's three points relies on a contention that there was "no evidence of a culpable mental state."[6] Defendant acknowledges that "[t]he defendant's mental state may be determined from evidence of the defendant's conduct before the act, from the act itself, and from the defendant's subsequent conduct." State v. Hineman , 14 S.W.3d 924, 927-28 (Mo. banc 1999). Having done so, she then fails to account for the evidence adduced at trial that supports an inference that she knowingly attempted to murder Victim and knowingly did so by means of a deadly weapon. The omission dooms any chance of prevailing on appeal.
"A person commits the crime of murder in the second degree if he: (1) Knowingly causes the death of another person, or with the purpose of causing serious physical injury to another person, causes the death of another person [.]" Section 565.021.1.
"Knowingly" means the person is "aware of the nature of [his or her] conduct," or "aware that [his or her] conduct is practically certain to cause that result." Sec. 562.016.3. Acting "purposely" occurs when it is a person's "conscious object to engage in that conduct *6 or to cause that result." Sec. 562.016.2.
State v. Thomas , 161 S.W.3d 377, 380 (Mo. banc 2005). "A person is guilty of attempt to commit an offense when, with the purpose of committing the offense, he does any act which is a substantial step towards the commission of the offense." Section 564.011.1.
As relevant here, "any person who commits any felony under the laws of this state by, with, or through the use, assistance, or aid of a dangerous instrument or deadly weapon is also guilty of the crime of armed criminal action[.]" Section 571.015. Any firearm qualifies as a "[d ]eadly weapon [.]" Section 556.061.10.[7] "[A]rmed criminal action requires a culpable mental state of acting purposely or knowingly." State v. Williams , 126 S.W.3d 377, 382 (Mo. banc 2004).
"The State may prove its case by presenting either direct or circumstantial evidence connecting the defendant to each element of the crime." State v. Jones , 296 S.W.3d 506, 509 (Mo. App. E.D. 2009). "Direct proof of the required mental state is seldom available, and such intent is usually inferred from circumstantial evidence." State v. Letica , 356 S.W.3d 157, 166 (Mo. banc 2011). "A person is presumed to have intended that death follow acts which are likely to produce that result." State v. Shaffer , 439 S.W.3d 796, 799-800 (Mo. App. W.D. 2014) (quotation omitted). Cf. State v. Harris , 854 S.W.2d 853, 856 (Mo. App. E.D. 1993) (evidence that the defendant fired a rifle toward the victim eight feet away after they had argued and "tussled" was sufficient evidence of second-degree murder).
Defendant insists that the trial court's findings rested upon the State's closing argument and what the trial court "thought" happened. Based upon that flawed premise, Defendant argues that no evidence proved an intent to commit murder, and the armed criminal action count cannot stand if the murder conviction fails. The State correctly notes that it is the evidence presented, and reasonable inferences drawn therefrom-not a prosecutor's argument-that is the relevant factor in determining whether a reasonable fact-finder could have found Defendant guilty beyond a reasonable doubt. See State v. Johnson , 316 S.W.3d 491, 498 (Mo. App. W.D. 2010) (it is the evidence and reasonable inferences therefrom, not the prosecutor's arguments, that are relevant in assessing the sufficiency of the evidence).
Defendant's arguments based upon her view of the evidence are of no analytical value as we are required to view the evidence in the light most favorable to the State. "The reliability, credibility, and weight of witness testimony are for the fact-finder to determine. It is within the fact-finder's province to believe all, some, or none of the witness's testimony in arriving at its decision." State v. Harrell , 367 S.W.3d 122, 126 (Mo. App. S.D. 2012) (internal citation omitted).
Here, a reasonable fact-finder could find beyond a reasonable doubt from the evidence adduced that Defendant did not accidentally shoot Victim but, instead, knowingly shot him in the head with a 9 mm handgun with the purpose of causing his death. Such evidence included, among other things, that Defendant was experienced in shooting firearms, she was upset with Victim over his failing to provide her with a form that she wanted, her response to Victim's request that she call 9-1-1 of telling Victim that her phone was not working, her written plea for forgiveness, her statement that the shooting "was not on *7 purpose [,]" and her inconsistent stories about what happened. Cf. id. at 127 (in the context of a changing story to explain incriminating facts, "inconsistent statements can demonstrate consciousness of guilt").
Defendant's points are denied, and her convictions are affirmed.
MARY W. SHEFFIELD, P.J.-CONCURS
GARY W. LYNCH, J.-CONCURS

Venue in the case was changed from McDonald County. Except where otherwise noted, all statutory references are to RSMo 2000, and all rule references are to Missouri Court Rules (2017).

In violation of Rule 84.04(a) and (c), Defendant's brief fails to provide a statement of facts that is "a fair and concise statement of the facts relevant to the questions presented for determination without argument." See also Rule 30.06(a). Defendant's statement of facts is just over one page long, and despite indicating that Defendant spoke with "police on the first couple of days following the incident," it provides no recitation of the content of those conversations, and it does not disclose that the substance of those conversations was not received into evidence. The purported statement of facts provides no other details about the evidence uncovered during the investigation of the shooting, even though the State presented eight witnesses at trial and introduced 20 exhibits. The failure to provide the facts necessary for our determination of the points presented is a basis for dismissing the appeal. See State v. Bradley , 8 S.W.3d 905, 906 (Mo. App. S.D. 2000). Because the State's brief contains a detailed statement of relevant evidence and procedural history (with citations to the transcript), we review Defendant's points ex gratia.

The letter was not filed or deposited with this Court.

Victim and Defendant were divorced at the time of trial.

Section 556.046.1(2), RSMo Cum. Supp. 2013, provides that "[a] defendant may be convicted of an offense included in an offense charged in the indictment or information.... when ... "[i]t is specifically denominated by statute as a lesser degree of the offense charged[.]" Murder in the second degree is included as a lesser degree offense of murder in the first degree. Section 565.025.2(1)(a). Additionally, an offense is also included when "[i]t consists of an attempt to commit the offense charged or to commit an offense otherwise included therein." Section 556.046.1(3), RSMo Cum. Supp. 2013.

Each point is deficient in failing to "[e]xplain in summary fashion why, in the context of the case, those legal reasons [identified by the appellant] support the claim of reversible error." Rule 84.04(d)(1)(C); see also Rule 30.06(a).

RSMo Cum. Supp. 2013.