

# Missouri Court of Appeals
## Southern District
### Division Two

STATE OF MISSOURI,         )
                                 )
      Plaintiff-Respondent,    )
                                 )
vs.                            )        No. SD35618
                                 )
ANGALINE RYAN,        )        **Filed: June 11, 2019**
                                 )
      Defendant-Appellant.    )

### APPEAL FROM THE CIRCUIT COURT OF TEXAS COUNTY

Honorable Judge John D. Beger

## AFFIRMED

Angaline Ryan ("Defendant") appeals her convictions, following a jury trial, for assault in the first degree and armed criminal action. *See* §§ 565.050, 571.015.[1] In two points relied on, Defendant claims: (1) the evidence was insufficient to support her convictions because the State presented no evidence identifying her as the perpetrator; and (2) the trial court erred in admitting evidence of certain expended shell casings because such evidence was not logically or legally relevant. Defendant's arguments are without merit, and the trial court's judgment is affirmed.

---

[1] All statutory references are to RSMo Noncum. Supp. (2014).

## Factual and Procedural Background

Viewed in the light most favorable to the verdict, *State v. Belton*, 153 S.W.3d 307, 309 (Mo. banc 2005), the following evidence was adduced at trial.

Tammy Shipp ("Victim") married Defendant's son in 2006. Victim and Defendant's son lived in the country on the same property as Defendant, in a house located approximately 100 yards from Defendant's house. Windows in the master bedroom of Defendant's house looked out onto Victim's house.

Defendant "wasn't happy" about her son marrying Victim. At one point during the marriage, Victim approached Defendant about the fact that Defendant's son had cheated on her, and Defendant told Victim, "well, you've got to put up with it." Victim's relationship with Defendant's son continued to deteriorate and they filed for divorce. Victim had discussions with Defendant regarding the pending divorce. Divorce proceedings were contentious until approximately four weeks before April 14, 2015, the scheduled court date for the divorce, when Defendant's son suddenly agreed to give Victim more than she had requested during negotiations. Pursuant to this agreement, Victim would be awarded full custody of their daughter, their house, three years of house payments, and child support.

On April 13, 2015, the day before the scheduled divorce hearing, Victim was shot. Victim had been out of town that morning for an appointment and planned to go directly to work afterwards. Driving back, she unexpectedly changed plans and returned home to change clothes. Victim had not advised Defendant of her schedule, nor did she tell anyone of the change in plans. At home, Victim let her three dogs outside. The dogs ordinarily barked at strangers, but did not normally bark at Defendant because they

2

were familiar with her.  In the approximately five-minute time period that the dogs were outside shortly before Victim left, "they were just quiet."

At about 2:10 p.m., Victim let the dogs back inside and walked out to her car. Victim had just sat down in the driver's seat when she "noticed someone come right around . . . the left of the garage[.]"  The individual was "definitely a woman."  She "resembled" Defendant, and was wearing dark clothing, a camouflage top, gloves, and a dark mask.  Although the person's face was concealed, Victim "could see the person's eyes[,]" her "shaped" eyebrows, and part of her nose.  The shooter's eyes were hazel and "familiar" to Victim because she "[had] seen them before."  Victim also discerned that the person was Caucasian and was "just glaring" at her.  After staring at Victim, the person raised a gun and shot her through the car window.  As the shooter was preparing to fire again, Victim screamed, "you know I have babies?"  The shooter "just kept shooting and shooting."  The shooter slowly turned away, and "walk[ed] back where [Victim's] garage was[.]"  The shooter's shape, height, and walk were "familiar" to Victim; Defendant "had that walk and that shape."

Although Victim was in "excruciating" pain, she started her vehicle and "laid on [her] horn to try to get someone."  Victim "just kept . . . driving and honking" until she reached her daughter's elementary school a few miles away.  The school's nurse came out and attempted to stop Victim's bleeding until an ambulance arrived.  During that time, Victim said that she thought Defendant's son "may have had [the shooting] done."

Victim was transported by ambulance to the nearest trauma hospital in Springfield having been shot in the chest, abdomen, arms, and legs.  Victim was experiencing "severe pain" but remained coherent.  Victim told the paramedic in the ambulance that a shooter had approached from the rear of her residence to the side of

3

her car, that she thought the shooter was a woman, that the shooter shot her with a handgun, and that the shooter then ran back behind the house. Later, in the emergency room at the hospital, Victim told Sergeant Carrie Roddy ("Sergeant Roddy") that she thought the shooter was Defendant, but she wasn't sure and that she thought Defendant was capable of shooting her.

Investigator Don Reid ("Investigator Reid") and Investigator Will Riley ("Investigator Riley") with the Howell County Sheriff's Office went to the location of the shooting. They observed broken glass on the concrete pad in front of the garage, Victim's shoe, and seven shell casings lying on the concrete and gravel driveway. The shell casings were all stamped, indicating that they were Winchester .380 auto handgun ammunition.

Shortly after 5:00 p.m., Investigator Reid was leaving Victim's house and passed Defendant driving home. He followed her to her home. Defendant walked into the house without acknowledging any of the law enforcement officers present. When Investigator Reid told Defendant that he would like to talk to her, Defendant "wasn't overly friendly" and responded that she did not have anything to say to him. Investigator Reid explained that he did not know anything about Victim's relationship with Defendant's son and asked "what their problem was," to which Defendant replied that "[Victim] had . . . hot panties." At no time did Defendant ever ask about Victim or her condition. Defendant also told Investigator Reid that she first heard Victim had been shot at 3:00 or 3:15 p.m. on the day of the incident

Investigator Paul Wells ("Investigator Wells"), a criminal investigator with the Missouri State Highway Patrol, also attempted to interview Defendant on April 13, 2015. From the beginning of the interview with Investigator Wells, "[Defendant] was reluctant

to provide [Investigator Wells] with . . . information," including her date of birth and address. Investigator Wells testified that Defendant's demeanor was "odd[,]" "wasn't welcoming" and "wasn't what [he] would consider to be routine in [his] experience with folks who are living nearby an incident that occurred that's violent[.]" Based on Defendant's unexpected demeanor, Investigator Wells inquired as to Defendant's whereabouts on the day of the shooting. Defendant responded that she "had been at her office in West Plains all day."

Defendant's friend Angela Stasney ("Stasney") arrived at Defendant's house at the end of Investigator Wells' interview with Defendant. Defendant remarked to Stasney, "wasn't it amazing that [Victim] knew to honk her horn to get attention?" Stasney had not previously heard that Victim had honked her horn. The only people that Victim remembered telling that she had honked her horn, were the officers who came to the hospital.

Surveillance video from the day of the shooting, recovered later, showed Defendant's vehicle left her office at approximately 12:11 p.m., and returned at approximately 2:29 p.m. Defendant was wearing a dark-colored top and black pants. Defendant was interviewed on April 15, 2015, two days after the shooting, and was asked again where she was at the time of the shooting. Defendant now answered she thought she had been at her mother's rental house around noon or 12:30 p.m. The following day, April 16, Defendant called Investigator Riley and told him "she had remembered . . . that she had went home that day" with her husband and had sex with him at lunch. On April 17, Defendant again called Investigator Riley to tell him "she had remembered that she did go home on that Monday around lunchtime, and that it wasn't . . . with her husband" but that "[s]he had to run home and get a zip drive for her office."

5

Defendant's home was searched two days after the shooting. A box of Winchester .380 auto ammunition was found in a walk-in closet in the master bedroom. Six bullets were missing out of the 100-round box. No .380 caliber weapon was found. Defendant stated that she did not own a .380 weapon, but that a "neighbor . . . at the river property" had talked to her about obtaining one.

Defendant and her husband possessed property in Ozark County along the White River ("the Ozark property"), approximately 20 miles from the scene of the shooting. A search warrant of the Ozark property was executed on April 16, 2015. Investigators collected 21 expended Winchester .380 caliber auto shell casings, along with spent projectiles and bullet fragments. It appeared that someone had been "target shooting" in the area from which the casings were recovered.

Alexander Belt ("Belt"), a firearm and tool mark examiner with the Missouri State Highway Patrol Crime Laboratory, examined and compared the shell casings from the scene of the shooting with those recovered from the Ozark property. After comparing the ejection port marks present on one of the casings from the crime scene and one of the casings from the Ozark property, Belt concluded that these two casings "displayed sufficient agreement of individual characteristics" and "that they were ejected from the same firearm." Belt also found that six of the seven casings at the scene of the shooting were fired from the same firearm, and that he could not determine whether the seventh casing had been fired from the same firearm. Belt also examined four Winchester .380 handguns. Testing eliminated three of those firearms as the one having fired the expended cartridge casings, but findings as to the fourth weapon were inconclusive.[2]

---

[2] Belt testified that two of the firearms he tested were Defendant's children's weapons. Testing eliminated one of Defendant's children's weapons as having fired the casings, but testing on the other weapon was inconclusive.

Defendant was charged by information with committing one count of the class A felony of assault in the first degree by "knowingly caus[ing] serious physical injury to [Victim] by shooting her[,]" and one attendant count of armed criminal action. *See* §§ 565.050, 571.015. Following a change of venue from Howell County, a three-day jury trial commenced in April 2018.

At trial, Victim testified about her memory of the shooting. She also testified that when she was at the hospital, Investigator Reid showed Victim a photo of Defendant's eyes, without telling Victim to whom the eyes belonged. Victim testified about her reaction to the photograph. "It was just very emotional. It was frightening. It was very familiar. Made me sick to my stomach. And then that's when I told him . . . I just didn't say it. I just was very upset and started crying." Stasney testified that shortly after Victim was released from the hospital, Victim told Stasney "that it was [Defendant.]"

Defendant did not testify on her own behalf. The jury found Defendant guilty as charged. Thereafter, the trial court sentenced Defendant to life imprisonment on the assault charge (Count I), to run consecutively with ten years on the armed criminal action charge (Count II). This appeal followed. Additional facts will be included below as we address Defendant's two points of error.

**Point 1**

Defendant's first point challenges the sufficiency of the evidence supporting the jury finding that she was the perpetrator of each offense, claiming, "there was insufficient evidence identifying [Defendant] as the shooter in that the State produced no eyewitness testimony or circumstantial evidence that positively identified [Defendant] as the shooter." We disagree.

7

Appellate review of a claim that there was insufficient evidence to support a criminal conviction is limited to a determination of "whether the [S]tate has introduced sufficient evidence from which a reasonable juror could have found each element of the crime beyond a reasonable doubt." *State v. Hosier*, 454 S.W.3d 883, 898 (Mo. banc 2015). In making that determination, great deference is given to the trier of fact, and an appellate court "will not weigh the evidence anew since the fact-finder may believe all, some, or none of the testimony of a witness when considered with the facts, circumstances and other testimony in the case." *State v. Nash*, 339 S.W.3d 500, 509 (Mo. banc 2011) (internal quotations and citations omitted). Additionally, we accept as true all evidence favorable to the State, including all favorable inferences drawn from the evidence. *Id.* We disregard all evidence and inferences contrary to the verdict. *Id.* However, "[t]he Court may 'not supply missing evidence, or give the [State] the benefit of unreasonable, speculative or forced inferences.'" *State v. Whalen*, 49 S.W.3d 181, 184 (Mo. banc 2001) (quoting *Bauby v. Lake*, 995 S.W.2d 10, 13 n.1 (Mo. App. E.D. 1999)). The State may meet its burden of proof by presenting either direct or circumstantial evidence connecting the defendant to each element of the crime. *State v. Mueller*, 568 S.W.3d 62, 66 (Mo. App. S.D. 2019). Furthermore, circumstantial evidence is given the same weight as direct evidence in considering whether there was sufficient evidence to support a conviction. *Id.*

The offense of first-degree assault occurs when a person "attempts to kill or knowingly causes or attempts to cause serious physical injury to another person." § 565.050.1. A person commits the offense of armed criminal action if the person "commits any felony under the laws of this state by, with, or through the use, assistance, or aid of a dangerous instrument or deadly weapon[.]" § 571.015.1. An essential

8

element of any crime is that the person charged with an offense is the person who committed the offense. ***State v. Plopper***, 489 S.W.3d 848, 853 (Mo. App. S.D. 2016); *see also* ***State v. Robinett***, 63 S.W.3d 236, 240 (Mo. App. W.D. 2001) ("[T]he State has the burden of proving beyond a reasonable doubt the identity of the person who committed the crime.").

Defendant's arguments under her first point fail because they misapply our standard of review by ignoring Victim's testimony, ample circumstantial evidence, and reasonable inferences from which a jury could properly conclude that Defendant was the person who shot Victim.

Defendant first contends the "State produced no eyewitness identification of [Defendant] as the shooter." This contention is an unduly narrow interpretation of the testimony adduced at trial. Victim testified that the shooter's eyes were hazel (the same color as Defendant's), that the eyes were familiar because she had seen them before, that the shooter was a Caucasian woman who resembled Defendant, and that the shooter had a "sort of boxy, sort of stocky" shape that "was familiar" and a "walk that was familiar" like the walk and shape of Defendant. During the shooting, Victim shouted "you know I have babies[,]" which the jury could reasonably interpret as a personal appeal to Defendant's knowledge of Victim's children. When shown a picture of Defendant's eyes, Victim testified that she became very upset and "told [the investigator]," but "just didn't say it." Stasney also testified that Victim "told" her Defendant was the shooter. Victim told Sergeant Roddy that she thought Defendant was the shooter. From the aforementioned testimony, the jury could have reasonably concluded that Victim identified Defendant as the perpetrator. It is well-established that "a criminal conviction may be sustained by the victim's testimony alone, even if that

9

testimony is uncorroborated." ***State v. Jackson***, 439 S.W.3d 276, 278 (Mo. App. E.D. 2014); *see also **State v. Wren***, 317 S.W.3d 111, 120 (Mo. App. E.D. 2010). The jury's verdict indicates that it found Victim's testimony to be credible evidence identifying Defendant as the shooter, and we defer to that determination. *See **Nash***, 339 S.W.3d at 509.

Furthermore, the State presented additional circumstantial evidence, other than eyewitness identification testimony, from which the jury could reasonably infer that Defendant was the shooter.

First, after the shooting, Defendant attempted to avoid speaking with investigators and had an "odd demeanor." Defendant also knew that Victim had honked her horn to get attention after she was shot, which was a detail of the attack Victim had only told the police. Then Defendant made multiple conflicting statements as to where she was and what she was doing during the time of the shooting. Defendant originally stated that on the day of the shooting she never left her office. Later, she told investigators she went to her mother's rental house. Then, unprompted, she called to tell investigators she went home to have sex with her husband. Finally, in another voluntary call, she told investigators that she was mistaken and that she had driven home to pick up a zip drive. The jury could consider these facts as evidence of Defendant's consciousness of guilt. *See **State v. Montiel***, 509 S.W.3d 805, 809 (Mo. App. S.D. 2016); ***State v. Chong-Aguirre***, 413 S.W.3d 378, 387 (Mo. App. S.D. 2013) ("Consciousness of guilt can be inferred from false statements made in an attempt to deceive the police."); ***State v. Harrell***, 367 S.W.3d 122, 127 (Mo. App. S.D. 2012) (observing that, in the context of a changing story to explain incriminating facts, "inconsistent statements can demonstrate consciousness of guilt.").

Second, circumstantial evidence was adduced from which the jury could reasonably infer that Defendant had the means and opportunity to commit the offense. As Victim's close neighbor with a view of her house, Defendant was in the unique position of knowing that Victim was home at the time of the shooting and Defendant had the unique opportunity to act precipitously. Video surveillance showed Defendant leaving and returning from work in a time period corresponding to the shooting. Investigators recovered bullet casings from Defendant's Ozark property, which a firearm examiner concluded were fired from the same weapon used in the shooting.[3] Also, bullets that were of the same caliber and from the same manufacturer as those used in the shooting were found in Defendant's residence.

Third, the evidence also showed a possible motive for Defendant's actions. Due to the pending divorce, Defendant's son could benefit financially and regain custody of their daughter if Victim was killed. Defendant had exhibited animosity towards Victim during her marriage to Defendant's son. When the identity of a perpetrator is in question, "motive is key." *State ex rel. Koster v. McElwain*, 340 S.W.3d 221, 253 (Mo. App. W.D. 2011), *as modified* (May 3, 2011) (quoting *House v. Bell*, 547 U.S. 518, 540 (2006)); *see also* *State v. Sherman*, 927 S.W.2d 350, 354 (Mo. App. W.D. 1996) (noting potential divorce and financial gain as motives and evidence of identity in upholding conviction for second-degree murder).

In finding the evidence sufficient to connect Defendant to the crime, we have considered and rejected Defendant's argument that any inferences or conclusions from the foregoing circumstantial evidence would be too remote and attenuated so as to be

---

[3] *See* discussion of Defendant's point 2.

unreasonable, and would require the jury to engage in impermissible inference-stacking. Defendant's numerous references to "impermissible inference and conjecture stacking" harken back to the circumstantial evidence rule that "originated as a higher standard to which circumstantial evidence cases were held." *State v. Grim*, 854 S.W.2d 403, 405 (Mo. banc 1993); *see Plopper*, 489 S.W.3d at 853. In *Grim*, our high court rejected the circumstantial evidence rule as a standard for reviewing the sufficiency of the evidence, recognizing that the "circumstantial evidence rule provides no more guidance" than the standard of review for cases involving direct evidence, "and a reviewing court, or a juror, must simply decide whether the theory presented is reasonable." *Grim*, 854 S.W.2d at 406; *see Plopper*, 489 S.W.3d at 853.

Although Missouri cases do refer to a prohibition against "inference stacking[,]" "[c]ourts and scholars have sharply criticized and even doubted the very existence of the 'rule.'" *State v. Kinsella*, No. ED105655, 2019 WL 1030174, at *10 (Mo. App. E.D. Mar. 5, 2019) (compiling authorities); *see also State v. Putney*, 473 S.W.3d 210, 220 (Mo. App. E.D. 2015). This purported rule "is essentially based on the fact that an inference cannot be based on insufficient evidence." *Kinsella*, 2019 WL 1030174, at *10 (quoting *State v. McMullin*, 136 S.W.3d 566, 572 n.5 (Mo. App. S.D. 2004)). It is well-settled that any number of inferences may be drawn in a given case provided each rests upon and reasonably arises from and out of facts and circumstances shown by the evidence, and "[t]he presence of parallel inferences consistent with guilt may be sufficient to support a finding of guilt." *Putney*, 473 S.W.3d at 220.

In this case, while it is true that a number of inferences must be drawn, we perceive no issue of attenuated logic. Sufficient evidence supports each inference favorable to the State's case. Because the contrary inferences are not "such a natural

and logical extension of the evidence that a reasonable juror would be unable to disregard them[,]" they must be rejected. *Grim*, 854 S.W.2d at 411. A juror could reasonably have concluded "from the collective impact of the evidence" that Defendant shot Victim. *Kinsella*, 2019 WL 1030174, at *11. Accordingly, the evidence was sufficient to uphold Defendant's conviction for assault in the first degree.

Lastly, in regards to the armed criminal action charge (Count II), "section 571.015.1 provides that any person who commits any felony under the laws of this state by, with, or through the use, assistance, or aid of a dangerous instrument or deadly weapon is also guilty of the crime of armed criminal action. . . ." *State v. Agee*, 350 S.W.3d 83, 90 (Mo. App. S.D. 2011) (quoting § 571.015.1) (internal quotations omitted). Any firearm qualifies as a deadly weapon. § 556.061(10); *State v. Halverson*, 541 S.W.3d 1, 6 (Mo. App. S.D. 2018). Because there was sufficient evidence that Defendant shot a firearm directly at Victim, the charge for armed criminal action is also supported by sufficient evidence. *See id.* Point 1 is denied.

## Point 2

Defendant's second point contends the trial court erred in admitting evidence of shell casings found on the Ozark property because "the evidence was not logically or legally relevant in that the evidence did not make it more or less probable that [Defendant] was the shooter and it permitted the jury to engage in impermissible inference and conjecture stacking[.]"[4]

"A trial court has broad discretion to admit or exclude evidence at trial." *State v. Blurton*, 484 S.W.3d 758, 769 (Mo. banc 2016). A trial court's ruling on the

---

[4] Defendant objected to the admission of this evidence through pre-trial motions and at trial. The evidence was admitted.

admissibility of evidence is reviewed for abuse of discretion. ***Id.***; ***State v. Peirano***, 540 S.W.3d 523, 527 (Mo. App. S.D. 2018). The trial court abuses its discretion when its ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration. ***Blurton***, 484 S.W.3d at 769; ***State v. Winfrey***, 337 S.W.3d 1, 5 (Mo. banc 2011). Furthermore, on direct appeal, "this Court reviews the [circuit] court 'for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial.'" ***State v. Forrest***, 183 S.W.3d 218, 223-24 (Mo. banc 2006) (quoting ***State v. Middleton***, 995 S.W.2d 443, 452 (Mo. banc 1999)).

Evidence must be logically and legally relevant to be admissible. ***Blurton***, 484 S.W.3d at 777. "Evidence is logically relevant if it tends to make the existence of a material fact more or less probable." ***State v. Tisius***, 362 S.W.3d 398, 409 (Mo. banc 2012) (quoting ***State v. Anderson***, 306 S.W.3d 529, 538 (Mo. banc 2010)). Determining whether evidence is logically relevant "is a very low-level test that is easily met." ***State v. Prince***, 534 S.W.3d 813, 819 (Mo. banc 2017) (quoting ***State v. Sladek***, 835 S.W.2d 308, 314 (Mo. banc 1992) (Thomas, J., concurring)). Logically relevant evidence also must be legally relevant to be admissible. ***Anderson***, 306 S.W.3d at 538. "Legal relevance weighs the probative value of the evidence against its costs—unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness." ***Id.*** If the prejudice of the logically relevant evidence outweighs its probative value, it should be excluded. ***Id.***

Defendant contends the shell casing evidence must be disregarded because the jury had to rely on impermissible inference-stacking to conclude from such evidence

14

that Defendant shot Victim.  Similar to point 1, this argument has no merit because it ignores evidence and reasonable inferences that we must credit in our review on appeal.

Belt testified that the shell casings from the scene of the shooting and those recovered from the Ozark property "displayed sufficient agreement of individual characteristics" and that it was his opinion "that they were ejected from the same firearm."  Investigator Wells testified that Defendant might have been a "part owner" of the Ozark property and that it appeared "target shooting" had occurred at the property. Victim testified that, in the year before the shooting, she had been to the Ozark property "a handful" of times, including a time when Defendant and her husband were there fishing.  Defendant had also told investigators that she had .380 ammunition because there was "a neighbor . . . at the river property that had talked to her about getting a .380."  Viewed in the light most favorable to the verdict, as we must do, this evidence when combined with Victim's testimony recounting the shooting made it more probable that Defendant had access to the same firearm that was used to shoot Victim, and thus it was more likely that she was the shooter.  *See **Wren***, 317 S.W.3d at 119-20 (reviewing the sufficiency of identity evidence and crediting ballistics testing which showed that various cartridge casings were fired from the same weapon).  Defendant fails to demonstrate how the shell casing evidence was unfairly prejudicial.

Here, the hypothesized conclusion "can fairly be drawn from the proven facts by reasonably intelligent minds."  ***Kinsella***, 2019 WL 1030174, at *10; ***Putney***, 473 S.W.3d at 220; ***McMullin***, 136 S.W.3d at 572 n.5.  The trial court did not abuse its discretion in admitting evidence of the shell casings recovered from the Ozark property. Point 2 is denied.

15

## Conclusion

The trial court's judgment is affirmed.

MARY W. SHEFFIELD, J. – OPINION AUTHOR

JEFFREY W. BATES, J. – CONCURS

WILLIAM W. FRANCIS, JR., P.J. – CONCURS